THE OVERLAND CORPORATION, FORMERLY WILLYS-OVERLAND MOTORS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 27836.   Filed April 9, 1964.

*Jay O. Kramer, Thomas J. Lynch,* and *Gilbert I. Falk,* for the petitioner.

*George J. LeBlanc* and *John W. Holt,* for the respondent.

WITHEY, *Judge:* The respondent denied petitioner's applications for relief and claims for refund of excess profits tax under section 722(b)(1), (b)(2), (b)(3), (b)(4), and (b)(5) of the Internal Revenue Code of 1939 for the fiscal years ended September 30, 1942 to 1945, inclusive.

After trial on the issues raised by the pleadings filed herein, this Court on September 16, 1960, filed its Findings of Fact and Opinion with respect thereto and on April 10, 1961, entered its decision. *Overland Corporation,* 34 T.C. 1001.

Petitioner and respondent each filed a petition for review of the decision of this Court with the United States Court of Appeals for the Sixth Circuit which on May 7, 1963, rendered its opinion, *Overland Corporation* v. *Commissioner,* 316 F. 2d 777, and on May 28, 1963, issued its mandate remanding the case to this Court for further consideration.   Accordingly the case is now before us under the mandate.

The issues presented for our decision in *Overland Corporation, supra,* were:

(1) Whether petitioner filed a timely claim for refund of its excess profits tax on the ground that it realized net abnormal income within the meaning of section 721(a)(2)(C) of the 1939 Code.

(2) Whether the respondent in his amended answer to the fourth amended petition made a timely claim for deficiencies in petitioner's excess profits tax for the fiscal years ended September 30, 1942 and

1943, on the ground that petitioner utilized an incorrect basis for computing depreciation, equity-invested capital, and a net operating loss carryover from 1940 to 1942 on property received in 1936 in exchange for its stock pursuant to a plan of reorganization of the Willys-Overland Co.

(3) Whether or not petitioner is entitled to relief under section 722(b)(2) of the 1939 Code on the ground that its earnings during the base period were depressed by reason of temporary economic circumstances unusual in its experience.

(4) Whether or not petitioner is entitled to relief under section 722(b)(4) of the Code on the ground that it commenced business immediately prior to the base period and failed to reach the earning level it would have attained had it commenced business 2 years earlier.

Under issue 1 we held that petitioner did not file a timely claim for refund of excess profits tax for the years in issue based upon the realization of abnormal income under section 721(a)(2)(C) within the period of limitations prescribed in section 322(b)(1) of the 1939 Code.

We held under issue 2 that respondent in his amended answer to the fourth amended petition made an untimely claim for deficiencies in petitioner's excess profits tax under the period of limitations prescribed in section 275(a) of the 1939 Code.

With respect to issues 3 and 4, we held in *Overland Corporation, supra*, that petitioner was not entitled to excess profits tax relief under section 722 (b)(2) or (b)(4).

The United States Court of Appeals for the Sixth Circuit reversed our decision under issues 1 and 2, *supra*. Accordingly, the two questions presented for our decision under the remand of the Court of Appeals are:

Whether petitioner realized net abnormal income within the meaning of section 721(a)(2)(C) of the 1939 Code during the fiscal years ended September 30, 1942 to 1945, inclusive, which is attributable to other years under section 721(b).

Whether for purposes of computing depreciation, equity-invested capital, and a net operating loss carryover from 1940 to 1942 the basis of assets received by petitioner in 1936 pursuant to a plan of reorganization under section 77B of the Bankruptcy Act of 1926 is the cost of the assets at the time of acquisition or their basis in the hands of the transferors.

#### GENERAL FINDINGS OF FACT

A portion of the facts have been stipulated and are hereby found as stipulated.

Our Findings of Fact in *Overland Corporation, supra*, are incorporated herein by this reference.

*Issue 1.   Section 721*

FINDINGS OF FACT

During the years 1938 through 1941 the normal process followed by petitioner in designing and producing a new car was as follows:

First, a series of conferences was held between engineers and top management, including sales, advertising, and financial personnel, to decide on the type of car that should be built.

As soon as an agreement was reached as to the type of car to be built, work normally was started in the engineering department to make overall layouts.   This was generally commenced with full-scale blackboard layouts or clay models, first in miniature, embodying various ideas of styling.   Later, a full-size clay model embodying the final styling was made.

After the styling was decided upon the car was laid out dimensionally in full scale and the chassis engineers began to arrange seating dimensions and the location of various units such as the axles, suspension, frame, and transmission.   These were moved around inside the context of the body layout until the point was reached where conditions were laid down for initial styling acceptance and body comfort.

After approval by the engineering department and management, working drawings were prepared.   These were split up into body drawings and chassis drawings.   Detail drawings were made of the units that go into the chassis.   A decision was made regarding parts to be purchased.   Drawings of these parts were made with necessary modifications shown in sufficient detail for the suppliers to put them into production.

Petitioner's experimental procurement division made the decisions whether to manufacture the various component parts or to purchase them from outside suppliers.   If the decision was made to manufacture them, it then became necessary to decide whether the parts should be fabricated in the petitioner's own toolroom or in special shops.

One or more prototypes of the chassis and one or more prototypes of the body were built by hand from the working drawings.

Body panels were hammered out by hand over forms.   The individual panels were checked against the drawings and after they were completed the body was assembled.

When the prototype car was assembled, it was complete as to interior design and finish and was put on the road for testing to evaluate its characteristics.   Extensive testing and experimenting were necessary to ameliorate differences, errors, and deficiencies.

If sufficient money was available, several prototypes were built so that the various features could be tested at the same time.   The engine division could be testing the engine behavior on one car, the suspen-

sion engineers could be observing the suspension on another car, and the body engineers were able to evaluate the body, seat comfort, and ride at the same time.

Upon acceptance of the prototype car, the design was frozen and drawings were released for preliminary tool design, preliminary tool purchase, and the making of dies.

When the tools were designed and released, commitments were made for material and a schedule was set up determining the time when the first vehicle was to come off the assembly line.

During this time a group of production engineers had been preparing cost estimates, tool estimates, and product cost estimates so that by the time the drawings were released, the standard cost based on an assumed rate of production had been determined.

Petitioner's method of operation as a commercial automobile producer throughout the years here material was basically that of an assembly manufacturer. It built its own engine and a few other component parts, but the bulk of the parts used in the production of its cars was purchased from other suppliers and coupled together by its engineers so as to conform to the model design.

The original concept of a light military vehicle that eventually culminated in the jeep was developed by the U.S. Army prior to the designing of pilot models or the submission of bids by petitioner.

During 1939, several civilian vehicles were tested by the Army Infantry Board as a light reconnaissance vehicle, but none of them was suitable, and the board concluded that the desired vehicle would have to be developed as a separate project.

As a result of these experiments, the Army developed a concept of a small four-wheel drive vehicle which could be used for reconnaissance, as a machinegun carrier, a cargo carrier, and a litter carrier. It envisaged a car that was small, rugged, and lightweight, with ample cross-country agility.

This concept resulted in part from the development of the Howie-Wiley machinegun carrier which was built by military personnel out of various standard automobile parts, some of which were taken from an Austin car. The Howie-Wiley carrier was not considered by the Army to be a practicable vehicle.

In March 1940, petitioner's president Joseph W. Frazer and Delmar Roos, vice president in charge of engineering, were invited by the Army to Fort Benning, Ga., to observe the machinegun carrier being developed by Howie.

During May 1940, Charles H. Payne, representing the American Bantam Car Co., contacted the Chief of Infantry with whom he discussed the possibility of developing a vehicle which would meet the Army's needs. Payne's purpose was to explore the possibilities of utilizing the design or chassis of the Bantam car as a basis for manu-

facturing a light military vehicle satisfactory to the Army. During a series of conferences which included Payne, the Chief of Infantry, and several Army technical advisers, the principal features of the vehicle desired by the Army were tentatively agreed upon.

A set of characteristics for a lightweight motor vehicle that could be used as a reconnaissance car, machinegun carrier, and cargo carrier was developed by the Army's Motor Transport Committee. These characteristics were based upon an outline of the general size and performance of the vehicle requested by the chiefs of the using arms and services of the Army, and related to the maximum and minimum wheelbase of the vehicle, maximum silhouette, top speed, minimum speed, high-gear ratio, angle of approach, and angle of departure. The specifications which were prepared by the Quartermaster Corps contained a complete description and the dimensions of a specific vehicle. However, the Quartermaster Corps did not attempt to establish the detailed design of the vehicle. The Chief of Infantry prepared tactical specifications which consisted of the height, silhouette, weight, capacity, cross-country performance, and the tactical functions of a vehicle in the light of the requirements of the using arm or branch of the Army.

On June 19, 1940, a subcommittee of the Army Ordnance Technical Committee visited the manufacturing plant of the American Bantam Car Co., located at Butler, Pa., and conferred with Bantam officials and engineers. The Bantam engineering and plant facilities were inspected. The engineering data and blueprints relating to the production of the Bantam car were examined and brief tests of the car were made. During these conferences, which lasted over a 2-day period, the design and desired characteristics of the light multipurpose vehicle desired by the Army were again discussed and a tentative sketch of it was made.

At a meeting of the Army Ordnance Technical Committee held on June 20, 1940, final recommendations of military characteristics for a 1/4-ton, four-wheel truck with a four-wheel drive were approved, sometimes hereinafter refered to as the 1/4-ton 4 x 4 truck.

In the development of the specifications of the jeep by the Army, maximum weight was originally set by the Quartermaster Technical Committee at 1,000 pounds. The maximum weight was increased as the development progressed in order to obtain a vehicle with the necessary qualities of maneuverability and ruggedness to meet the Chief of Infantry's tactical specifications.

On July 2, 1940, the Quartermaster General issued specification ES–No. 475, which was a list of tentative specifications for a light reconnaissance and command car (four wheels—four-wheel drive). In preparing this specification, the Quartermaster General made several changes from his previous tentative specifications. Among

the changes were (1) an increase in the overall height from 36 to 40 inches, which resulted from a desire to have a tire that was interchangeable with the tires of passenger vehicles and at the same time accommodate available engines, and (2) an increase in the wheelbase from 75 to 80 inches to accommodate a transfer case for a four-wheel drive.

In tentative specification ES–No. 475, the weight of the proposed vehicle was increased from 1,000 to 1,270 pounds because the Quartermaster Corps recognized that it would be almost impossible to manufacture a vehicle at 1,000 pounds with the materials then available.

In tentative specification ES–No. 475, the angles of approach and departure were standard military specifications. Also specified were piston displacement, torque output, top speed, the inclusion of an oil filter that passed the Bureau of Standards' test, and certain limited specifications with respect to the transmission, transfer case, and axle-gear ratios, which were imposed due to the Quartermaster's knowledge of available commercial units. The tire size was also specified.

The purpose of the specifications and body drawings prepared by the Quartermaster Corps was to meet the requirements of the using services as set forth in the military characteristics, while at the same time relying upon the commercial automobile industry to complete the detailed design of the vehicle.

On July 11, 1940, the Quartermaster Corps issued invitations to bid on 70 "light reconnaissance and command" vehicles. The bid invitations were sent to 135 manufacturing concerns throughout the United States. The invitations were accompanied by a statement of specifications and an outline drawing. The weight specifications in the invitation to bid had been increased from the weight specified in specification ES–No. 475 to 1,300 pounds. The proposed vehicle was to carry a payload of 600 pounds, and the gross vehicle weight was to be 1,900 pounds.

The proposed vehicle was to have a maximum speed of not less than 50 miles per hour, with a minimum speed of not more than 3 miles per hour. The cruising range was specified at 150 miles at an average speed of 35 miles per hour on good roads, on one tankful of gasoline, without adding oil. The wheelbase was to be not more than 80 inches. The ground clearance under the axles was to be not less than 8½ inches. An angle of approach of not less than 45 degrees was specified, and an angle of departure was set at not less than 40 degrees. The overall height of the truck was in no event to be greater than 40 inches.

The specifications further provided that the engine was to be a four-stroke cycle internal combustion engine with not less than four cylinders. The piston displacement was to be not less than 85 cubic inches, and the engine was to develop 65 pounds-feet torque, using a fuel of not more than 68 octane number. Cylinder heads were not to

be made of aluminum. The crankshaft was required to be counterbalanced and supported by at least three main bearings.

In response to the invitation to bid, petitioner first prepared a design of the vehicle it desired to build. It then did some rapid layout work, making outline drawings based upon its own four-cylinder engine before attempting to construct a vehicle in accordance with the original specifications.

Of the 135 manufacturers that were solicited by the Quartermaster Corps, only 2 companies submitted proposals—American Bantam Car Co. and petitioner. The bids were opened on July 22, 1940.

In its proposal, American Bantam Car Co. specified delivery within the 75 days allowed in the invitation to bid. Petitioner specified delivery in 120 days. Although petitioner's per unit bid price was lower than Bantam's, its specification of 120 days for delivery incurred a $5 per day penalty which made its price higher. American Bantam Car Co. was awarded the contract for 70 vehicles.

After American Bantam Car Co. received the order for the 70 vehicles covered by the invitation to bid issued July 11, 1940, an officer of the Quartermaster Corps suggested that petitioner, at its own expense, build a vehicle around the general dimensions shown in the Army's outline blueprint. Later the Ford Motor Co. also expressed interest in producing the jeep and was permitted at its own expense to build a pilot model for testing by the Army.

Petitioner's engineering department discussed this proposal with its executive committee and asked for an appropriation of $15,000 and permission to proceed with the construction of two pilot models, one two-wheel steer and one four-wheel steer, embodying its own engine and design.

Petitioner's executive committee and president approved the construction of the two pilot model vehicles and authorized an appropriation of $15,000 on August 19, 1940, for this purpose.

Petitioner built its pilot model around its own four-cylinder engine and ignored the Army's specification on weight.

Petitioner prepared a general layout of the chassis starting with the frame. It made provision for placing the engine on the frame as well as for the transfer case, the transmission, and the front and rear axles.

After the designs were definitely decided upon, petitioner submitted the layout to Spicer Manufacturing Co., its supplier of axles and transfer cases, so that Spicer could advise Willys-Overland what it was able to furnish or build to petitioner's requirements to fit the general layout.

Each supplier which manufactured parts or assemblies for petitioner prepared its layout and then conferred with Willys-Overland's engineers. During such conferences, alterations and adjustments

were made so that the required part could be made with the supplier's production facilities and be reconciled to petitioner's requirements.

The axles employed in the jeep required a great deal of study because an axle ratio was needed as a result of petitioner's decision to use its own four-cylinder engine which would conform to the power output of that engine. It made a thorough analysis of performance on the basis of the axle ratio needed for its engine.

The front axle presented a problem because of the need to turn the hypoid gear upside down while at the same time line up the differential so that the propeller shafts would clear the transfer case. Petitioner discovered that it was necessary to change the center distance and position of the transfer case in order to line up the propeller shafts properly. The greater portion of the engineering work performed on the axles, as well as the transfer case and the other components of the four-wheel drive, was done by the Spicer Manufacturing Co.

The engine used in the jeep had the valves located on the left-hand side. This created a problem in connection with the location of the front axle differential since the vehicle was to have a four-wheel drive. In order to overcome interference from the right-hand side of the engine with the axle, double pinion housing, and propeller shafts, the engine had to be shifted 2 inches to the left of the center line of the vehicle.

This arrangement allowed the steering gear and pedals to be placed to the left of the engine under the carburetor and manifolds. The propeller shaft for the front axle was installed on the right side of the engine under the starter, generator, and battery.

Considerable difficulty was encountered in constructing the four-wheel drive so as to accommodate the engine mounted in an off-center position.

Petitioner's design provided for the front and rear differential housing and the transfer case gear train to be placed to the right of the center line of the vehicle.

Motor vehicles with four-wheel drives had been built since 1908.

Many special parts required in building the jeep necessitated special design and fabrication. These included the transmission, transfer case, axles (including a front axle with a differential), universal joints, steering gear and linkage, muffler, carburetor, propeller shafts, and the body, hood, and fender sheet metal.

However, more than one-half the parts used in the assembly of the jeep were standard parts and were also used in the production of the Willys commercial automobile. Most of the devices used in petitioner's jeep which were not customarily utilized in commercial automobiles were well known to the automotive industry. Those parts used in the jeep which were not previously known to the industry were

minor and were devised through the application of standard engineering techniques.

The first two Willys-Overland pilot models were built around its civilian passenger car frame, reduced to meet the wheelbase and overall requirements of the specification dated July 2, 1940. Changes were made in the springs and suspension in order to get a silhouette as low as specified. The Spicer axles and petitioner's transmission had to be specially designed to fit the wheelbase requirements since the vehicle was to have a four-wheel drive and petitioner's engine was different from competitive engines.

All the modifications of the axles and transfer case were worked out by petitioner's engineering department from layouts and were given to Spicer Manufacturing Co. so that its designs could be altered to meet petitioner's requirements as revised. Spicer Manufacturing Co. specialized in the manufacture of automobile power trains. Spicer performed extensive engineering work before a satisfactory axle was finally obtained to be installed in the pilot model vehicle that had the correct axle ratio and proper steer angle latitude. When this was done, petitioner approved the layout and design and authorized the manufacturer to build axles and transfer cases.

Petitioner's engineers worked in cooperation with the Spicer organization in the adaptation of axles to the necessary dimensions, sizes, weights, and requirements to meet the torque of petitioner's engine, the tread of the pilot vehicle, and the outlet of the offset differential housing.

The transfer case built by Spicer was later modified to take care of the offset location of the engine and provide for the propeller shaft to be put on the right-hand side of the vehicle.

Because the specification called for a maximum height of 40 inches and because petitioner's engine was a large displacement engine with long connecting rods, petitioner had to make a short carburetor from a standard carburetor within the cramped space available under the hood. It was also necessary to reduce the riser by over an inch to lower the carburetor. The reduction of the riser required internal changes in the intake manifold to get proper fuel distribution.

The first pilot model vehicle built by the American Bantam Car Co. pursuant to the contract awarded it on July 22, 1940, for the constuction of 70 vehicles was delivered to the Quartermaster Corps at Camp Holabird, Md., on September 23, 1940. A series of tests was made of the Bantam model and the results were found by the Army to be favorable. Officers of petitioner were present at Camp Holabird during October 1940 and observed the design and performance of the Bantam model. The Bantam pilot model weighed 2,030 pounds instead of the specified weight of 1,300 pounds.

The remaining 69 vehicles due under the Bantam contract were delivered by December 17, 1940, and were distributed among a number of Army camps for inspection and testing. The results of the testing were regarded by the using arms as favorable.

Petitioner's pilot model was delivered to the Quartermaster Corps on November 13, 1940, and testing was begun on that date with representatives of its engineering staff in attendance. The Ford pilot model was delivered on November 23, 1940. The tests included driving the vehicle 6,840 miles over various kinds of terrain. Such testing involved driving the model over a highway run as well as rough country, including ditches, holes, a mud lake, and sand. The tests continued until January 10, 1941.

Petitioner's pilot model weighed 2,520 pounds, including a full load of gasoline, oil, and water.

After the tests were completed on January 10, 1941, the petitioner's pilot model was returned to Toledo for dismantling and inspection.

During the conduct of the tests petitioner had been advised that the Army was going to change the specifications and permit Bantam, Ford, and Willys-Overland to bid on 1,500 prototype vehicles.

The weight specification as a result of the tests of the pilot models was raised to 2,175 pounds. Consequently petitioner commenced a thorough weight reduction program on its pilot model in order to bring it within the revised specifications. The gauge of body metal was reduced wherever a lighter gauge body metal could be used safely. The frame was redesigned using light alloy steel for the thinner sections. Holes were drilled into the frame to eliminate nonfunctioning metal. Welded strap reinforcements were used on the top and bottom flanges for the purpose of achieving economy of materials and retention of strength. Holes were also drilled into the reinforcements to take out nonfunctioning metal.

The flywheel was further lightened. The thickness of the skid pan under the engine was reduced. Bolts were shortened so that there was no extra length beyond the nuts.

The fender design of petitioner's original pilot model was unnecessarily heavy and petitioner reduced weight by designing an open-type fender.

The entire front end design was changed with a stamping substituted for the very heavy grill used on the original pilot model to protect the radiator.

The thickness of the metal in the manifolds was reduced one thirty-second of an inch.

A weight analysis was made of each individual part of the vehicle in order to meet loading specifications, maximum length, and at the same time reduce the weight as much as possible.

Through the weight-reducing program petitioner was able to overcome a handicap of 98 pounds of excess weight in its engine and radiator and to design a vehicle which met the Army specifications. The dry shipping weight of petitioner's revised model jeep was 2,169 pounds.

Petitioner received contract No. W–398–qm–8888 dated December 5, 1940, for the manufacture and delivery of 1,500 of its revised model jeeps (designated model MA). Both American Bantam and Ford also received orders for 1,500 of their vehicles at this time.

With the purchase of 1,500 units from each of the three companies arrangements were made for service tests and evaluation to be conducted by the Army Quartermaster Corps, assisted by representatives of the Infantry, Field Artillery, Cavalry, and Armored Force.

The principal differences between the petitioner's original pilot model and its model MA were: (1) The front end design was totally different, (2) fender construction was totally different, (3) the frame design was radically changed, and (4) the weight was reduced from 2,520 pounds in the pilot model to 2, 169 pounds.

Each of the pilot models built by American Bantam, Ford, and petitioner was found by the Army to be satisfactory. Each was found to be superior to the others in some respects and inferior in other respects. The Bantam model had the advantage of lower fuel consumption and the ability to stop within shorter distances. The Ford model had a more desirable arrangement of gearshift and handbrake levers resulting in greater driver comfort.

The principal advantage of the Willys-Overland model was in its more powerful engine resulting in greater acceleration, power, top speed, and hill climbing ability. Petitioner's engine developed more horsepower and torque than the engine used in the Ford and Bantam pilot models. The Bantam model used a Continental engine of about 110-cubic-inch displacement while the Ford model had a slightly larger engine of between 120- and 124-cubic-inch displacement which had been modified from the Ford tractor engine. Both the Bantam and Ford engines developed approximately 48 horsepower and their torque was approximately 30 percent less than petitioner's engine. The Willys engine utilized in petitioner's jeep was of 134.2-cubic-inch displacement and delivered approximately 63 horsepower.

At a meeting of the Quartermaster Technical Committee on June 27, 1941, certain revisions in the military characteristics of the jeep were formulated. The Quartermaster Corps considered the jeep to be standarized as of that date.

Based upon tests of the 1,500 vehicles purchased from each of American Bantam, Ford, and petitioner the military characteristics were revised as of July 1, 1941, to replace military characteristics MCM No. 8 dated December 31, 1940. These military characteristics were ap-

proved for the purpose of issuing specifications on which future orders were to be based.

The Army issued revised specifications for the jeep on July 7, 1941.

The jeeps built by petitioner subsequent to the issuance of the revised military specifications of July 7, 1941, were designated its model MB jeep. The principal difference between its model MA and its model MB jeep was in the appearance of the front end.

In the model MB jeep the belt crank center on which the tie rods tie into the belt crank was raised so that tie rods could clear any road obstacles that could pass under the front bumper guard.

When petitioner was developing the final MB military version of the jeep, the Army advised that it changed the specification to provide for a 15-gallon gasoline tank. This presented a difficulty because in the original pilot model and model MA, the gasoline tank was located under the front seat. It could not be made taller without interfering with the seat cushion nor could the tank be lowered without interfering with the frame. Petitioner, therefore, designed an L-shaped gasoline tank that went over the edge of the frame between the outer edge of the body and the inner rim of the frame. This tank became commonly known as the "cow belly" tank.

The "cow belly" tank had to be protected from brush, branches, and obstacles that might hit the tank and make it leak. An extension of the body in a boxlike form was devised by petitioner to surround the tank and provide this protection. This form was provided with two drain caps in case any gasoline overflowed from the tank.

Since noise is a factor in a military vehicle, petitioner undertook a considerable muffler development program to design a muffler that would not reduce power output as a result of back pressure, and still operate at an acceptable noise level. The muffler development work was done at petitioner's plant in Toledo and the muffler manufacturer's plant as well as at Camp Holabird.

Since the jeep was designed to operate cross-country, petitioner designed a neoprene seal with a metal cap to seal the grease in the spring shackles and seal out mud and water.

Because of the requirement that the jeep operate over unimproved roads, trails, and open, rolling, and hilly cross-country, petitioner experimented with the carburetor and manifolds to develop a carburetor that would permit fuel to pass through it to the manifolds when the jeep was operated on side slopes up to a 40-percent grade and on longitudinal slopes up to a 60-percent grade.

Petitioner designed an idler pully on the generator that could be released quickly so that the fan belt would be loose and would not turn while the jeep was fording deep water under its own power. This feature was peculiar to the jeep.

Petitioner designed a flexible rubber mounting to hold a heavy, high-capacity generator on the jeep engine and absorb engine vibrations without breaking. This design was new and had not been used on any other vehicle previously.

As a result of the service tests the problem arose of keeping the air cleaner intake free of mud and splash water. Due to space limitations under the hood and the size of the carburetor air cleaner used in the jeep, it was impossible to mount the air cleaner on the engine. Petitioner finally perfected an arrangement for mounting the air cleaner on the dash, with proper protection for the air intake and a flexible connection between the air cleaner and the carburetor. It also designed a hood that went over the carburetor in order to connect it with the flexible connection between it and the air cleaner and to keep the carburetor casting from breaking.

The top speed of petitioner's jeep was about 70 miles per hour.

On July 11, 1941, the Quartermaster Corps issued invitations to bid on 16,000 vehicles, based upon specifications which had been standardized on June 27, 1941. In response to the bid invitations, the Quartermaster Corps received price quotations from four bidders, viz, Ford Motor Co., American Bantam Car Co., petitioner, and Checker Cab Co., an affiliate of General Motors Corp. The bids were opened on July 21, 1941. The bid prices were as follows:

American Bantam Car Co., $788.32 per unit;
Ford Motor Co., $782.59 per unit;
Willys-Overland, $752.50 per unit, less a discount of one-half of 1 percent if paid within 30 days, or a net bid price of $748.74 per unit; and
Checker Cab Co., $736.53 per unit.

Since the Checker Cab Co. had never submitted a pilot model, its bid was not considered.

On July 30, 1941, a memorandum containing an analysis of the four bids submitted for the contract to manufacture 16,000 ¼-ton 4 x 4 trucks was prepared by officers of the Quartermaster Corps and delivered to the Quartermaster General. The memorandum stated, in part, as follows:

On the order for 1,500 similar trucks placed with the Willys-Overland Motors, Inc. the company was very late in getting started in their production due largely to their failure to meet the weight limitations of the specifications, although they were originally scheduled to begin production on that order on March 14, 1941 delivery actually did not start until June 7, 1941 and their contract has not yet been completed but it is expected they will be complete by August 4th which under their contract, as it has been extended, is now final completion date. The Ford Motor Company on a similar contract for 1,500 jobs were scheduled to start delivery March 10th and actually started delivery March 3rd, and although they had a strike at the plant of twenty-three days they

completed their contract on May 19, 1941 which was one month ahead of the time scheduled.

\* \* \* \* \* \* \*

Consideration also must be given to the ability to obtain spare parts for the maintenance of these vehicles, and if the contract is awarded to the Ford Motor Company the prompt furnishing of such parts will be more certain and sure than from a smaller company not having the resources that the Ford Motor Company is able to command. \* \* \*

On July 31, 1941, the Quartermaster General requested the approval of the Under Secretary of War Robert P. Patterson for an award of the contract for 16,000 vehicles to Ford Motor Co. The Under Secretary of War approved the request.

On July 31, 1941, the Quartermaster General also requested clearance of the Office of Production Management for awarding the contract to Ford. The request for clearance was denied on the same date by Donald M. Nelson, Director of Purchases of the Office of Production Management.

Following the denial of his request by the Office of Production Management, the Quartermaster General recommended the award of the contract to petitioner in a memorandum addressed to the Under Secretary of War. Clearance of the proposed award to petitioner was approved by the Director of Purchases of the Office of Production Management on July 31, 1941.

On August 1, 1941, the Under Secretary of War wrote to William S. Knudsen, Director General of the Office of Production Management, as follows:

I wish to set forth my reasons for approving the recommendation of the Quartermaster Corps that the order for 18,000 ¼ ton trucks be placed with Ford rather than Willys.

The first reason is that there would be more certainty of prompt deliveries by Ford than by Willys. Past experience of the Quartermaster Corps with the two companies indicates that Willys is much less reliable as to punctuality in deliveries. Swiftness in deliveries was one of the prerequisites stressed by the General Staff in directing that cars of this type be procured. This factor, in my opinion, more than balanced the slight difference in price quoted by Willys.

The second and more important reason is that Ford is a much stronger source of supply than Willys. Problems of maintenance and supply are of great importance with automobiles in use by the military forces, of greater importance even than with ordinary civilian use. It is well known, I believe, that people generally prefer to purchase automobiles from strong concerns rather than from concerns whose future existence is doubtful. The Army should be reasonably sure in procuring automotive vehicles that there will be a supply of spare parts for years to come as well as a supply of future vehicles of the same design for further procurement. On this point, there is no doubt of the future supply on the part of Ford. With Willys, the outlook is much less certain.

The responsibility for ordering these cars from Willys rather than from Ford is not that of the War Department. The procurement of the cars from Willys came about simply because the Office of Production Management would not approve an award to Ford.

In response thereto William S. Knudsen wrote the Under Secretary of War the following reply :

Replying to your letter of today regarding the contract for ¼ ton trucks, your position is correct except for one point which I made perfectly clear in our meeting. The bids were shown and two bidders were lower than Ford. One bidder was checked out on account of no previous experience with the vehicle. The other bidder has furnished satisfactory vehicles to the Department. That the Ford Company is a greater firm than Overland is admitted, but on the other hand I feel that Willys is perfectly capable of making 18,000 vehicles as per his bid.

If we are going to give all the truck business to four large companies and euchre the bids to accomplish this, we should not ask for bids at all. As far as I am concerned, I understand your Government policy to be that the lowest responsible bidder gets the job. Willys was low by about $700,000.00 and is in my judgment responsible.

On August 1, 1941, petitioner was notified by telegram of the award to it of the contract for manufacturing 16,000 vehicles. The contract was executed on August 13, 1941, and was assigned contract No. W–398–qm–10757. The number of vehicles to be furnished under the contract was later increased to 18,600.

During October 1941, the Army decided to establish two sources of supply in the event of an emergency caused by enemy bombing or sabotage. Accordingly, the Army proposed that Ford Motor Co. manufacture the jeep according to petitioner's design, including the Willys motor. It was further specified that every part, including the engine, in the proposed vehicle be built by Ford to be interchangeable with petitioner's vehicle.

Although this procedure was revolutionary to the automotive industry, both Ford and petitioner agreed because of the wartime emergency. Petitioner turned over a complete file of blueprints, drawings, bills of material, specifications, and parts lists to Ford Motor Co. and furnished enginering assistance to enable Ford to commence production.

The jeep built by Ford which was interchangeable with petitioner's jeep was built from petitioner's blueprints on Ford's production line.

Conversion of the military jeep for civilian use required the elimination of military characteristics such as military-type wheels, tool holders, water resistance, and the adjustment to the generator for running under water.

Petitioner introduced a six-cylinder motor into its jeep in 1949. Until that time it had manufactured the jeep with only its four-cylinder motor.

As of November 30, 1944, petitioner produced and delivered 283,420 jeeps to the Army, and Ford Motor Co. manufactured and delivered to the Army 237,163 jeeps. From October 1945 to March 31, 1953, petitioner produced and sold 381,661 jeeps with four-cylinder engines.

During this latter period 307,511 of the jeeps produced and sold by petitioner were commercial vehicles sold to civilian purchasers.

The jeep was not solely the product of petitioner or of any single manufacturer, but resulted from the combined efforts of the U.S. Army, American Bantam Car Co., petitioner, and Ford Motor Co. The Spicer Manufacturing Co. also made a significant contribution to the production of the jeep by reason of its work in perfecting the four-wheel drive.

The work performed by petitioner in perfecting an acceptable model of the ¼-ton 4 x 4 truck for the Army was essentially the same type of work which it normally performed in designing its commercial automobiles for the civilian market.

#### ULTIMATE FINDING

Petitioner did not realize net abnormal income during its fiscal years ended September 30, 1941 to 1945, inclusive, which is attributable to other years by reason of any research or development of tangible property.

#### OPINION

Petitioner contends that it is entitled to relief from excess profits taxes for the fiscal years ended September 30, 1942, through September 30, 1945, on the ground that during those years it realized abnormal income resulting from research or development of tangible property under the provisions of section 721(a)(2)(C) of the 1939 Code [1] which is attributable to prior years by virtue of section 721(b). Petitioner's claim is based upon its work in building a lightweight, multipurpose military vehicle, commonly known as the jeep.

The respondent has taken the position that the jeep did not result from petitioner's "research, or development" within the meaning of section 721(a)(2)(C); and further, that even if it did so result, such research did not extend over a period of more than 12 months; and finally, assuming that petitioner's research extended over a period of more than 12 months, the respondent contends that the abnormal earnings resulting from the sales of the jeep during the period September 30, 1942, through September 30, 1945, were attributable to factors other than research or development.

The concept of a light, rugged, multipurpose vehicle with a four-

---

[1] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

\*        \*        \*        \*        \*        \*        \*

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income :

\*        \*        \*        \*        \*        \*        \*

(C) Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months; \* \* \*

wheel drive and the ability to travel over rough hilly terrain was originated by the U.S. Army. The Army prepared a set of characteristics for a vehicle that could be used as a reconnaissance car, machine-gun carrier, and cargo carrier. These characteristics consisted of such items as the tactical functions of the vehicle, together with specifications as to its height, weight, capacity, silhouette, maximum and minimum wheelbase, top speed, minimum speed, angle of approach, and angle of departure. However, the Army made no attempt to establish the detailed design of the vehicle.

The first manufacturer to contact the Army with the definite intention of producing the contemplated vehicle was the American Bantam Car Co. On June 19, 1940, representatives of the Army Ordnance Technical Committee visited the Bantam plant, inspected its facilities, conferred with its engineers, and examined the Bantam car. During these conferences, which lasted over a 2-day period, the design and characteristics of the vehicle desired by the Army were discussed and a tentative sketch of it was made.

On July 2, 1940, the Quartermaster General issued a list of revised tentative specifications for the desired light reconnaissance and command vehicle.

On July 11, 1940, the Quartermaster Corps issued invitations to bid on 70 vehicles. The bid invitations were accompanied by a statement of specifications and an outline drawing. Only two bids were submitted—one by petitioner and one by the American Bantam Car Co. The bids were opened on July 22, 1940. Because of the inability of petitioner to specify delivery within 75 days, the contract for 70 vehicles was awarded American Bantam Car Co. Thereafter an officer of the Army Quartermaster Corps suggested to Willys-Overland that it build a pilot model at its own expense.

Bantam delivered its first pilot model to the Army Quartermaster Corps at Camp Holabird, Md., on September 23, 1940, and a series of tests was made. Officers of Willys-Overland were present at Camp Holabird during October 1940 and observed the design and performance of the Bantam model.

Petitioner delivered its pilot model to the Quartermaster Corps on November 13, 1940, and testing was begun on that date.

Meanwhile, Ford Motor Co. also had become interested in producing the jeep and had built its own pilot model. The Ford model was delivered to the Army on November 23, 1940.

On or about December 5, 1940, Bantam, Ford, and petitioner each received an order for the manufacture and delivery of 1,500 vehicles. Upon delivery of these vehicles further tests and evaluations were made by the Army.

Each of the pilot models built by Bantam, Ford, and petitioner was found by the Army to be satisfactory. Each was found to be superior

to the others in certain respects and inferior in other respects. The principal advantage of the Willys-Overland model was in its more powerful engine. The Bantam model had the advantages of lower fuel consumption and the ability to stop within shorter distances. The Ford model had a more desirable arrangement of gearshift and handbrake levers, resulting in greater driver comfort.

On July 11, 1941, the Quartermaster Corps issued invitations to bid on 16,000 vehicles, based upon specifications which had been standardized on June 27, 1941. In response, four bids were submitted and opened on July 21, 1941: Ford Motor Co. submitted a bid of $782.59 per unit; American Bantam Car Co. bid $788.32 per unit; Willys-Overland bid $752.50 per unit, less a discount of one-half of 1 percent if paid within 30 days; and Checker Cab Co., an affiliate of General Motors, bid $736.53 per unit. Since the Checker Cab Co. had never submitted a pilot model, its bid was not considered.

On July 31, 1941, the Quartermaster General and the Under Secretary of War, Robert P. Patterson, requested the approval of the Office of Production Management for the purchase of 16,000 jeeps from the Ford Motor Co., despite the fact that it was not the low bidder, because past experience had indicated that Ford was better qualified to make punctual delivery of the urgently needed vehicles than was Willys-Overland. The Quartermaster General also felt that Ford would be a more dependable source of supply of spare parts than petitioner.

In response to the request of the Quartermaster General and the Under Secretary of War for clearance to purchase the 16,000 jeeps from Ford, William S. Knudsen, Director General of the Office of Production Management, refused to approve such contract because of the policy of the U.S. Government to award contracts to the lowest bidder and accordingly recommended the award of the contract to petitioner. Willys-Overland was notified on August 1, 1941, that it had received the contract for 16,000 vehicles. The number of vehicles to be furnished under the contract was later increased to 18,600.

During October 1941, the Army decided that as a precautionary measure it needed to establish a secondary source of supply for the jeep. Ford Motor Co. was requested to manufacture a quantity of ¼-ton 4 x 4 trucks identical in design and construction to the vehicles produced by petitioner. Willys-Overland agreed to this arrangement in view of the wartime emergency and turned over to Ford a complete file of blueprints, drawings, specifications, bills of material, and parts lists. The parts used in the construction of the jeeps produced by Ford and those manufactured by petitioner were completely interchangeable.

Although petitioner made an outstanding contribution to the development of the jeep, it is apparent from the record that this vehicle was not solely the product of petitioner or of any single manufacturer,

but represented the combined efforts of the U.S. Army (with which it originated), American Bantam Car Co., petitioner, and Ford Motor Co. The Spicer Manufacturing Co. also made a significant contribution toward the production of an acceptable vehicle by its work in developing a suitable four-wheel drive. Inasmuch as petitioner contributed only a portion of the engineering work leading to the acceptance of the jeep, it obviously is not in a position to claim that its income from sales of the jeep constituted income attributable solely to its research or development, assuming that its own engineering work could be so characterized. *Coe Laboratories, Inc.*, 34 T.C. 549.

However, even if the ¼-ton 4 x 4 trucks produced originally for the U.S. Army and subsequently for civilian use were in fact the exclusive result of petitioner's efforts, it nevertheless has failed to establish that its work in designing and building the jeep constituted "research, or development of tangible property" within the meaning of section 721(a) (2) (C) of the 1939 Code. It is, of course, true, as petitioner points out, that the product resulting from a taxpayer's research or development need not be completely novel in order to qualify under section 721(a) (2) (C). *Ohio Machine Tool Co.*, 18 T.C. 330; *Keystone Brass Works*, 12 T.C. 618; *General Tire & Rubber Co.*, 29 T.C. 975. But the work performed by the taxpayer in developing a marketable product must in fact constitute "research, or development"; it must constitute a "radical departure from the art and methods of manufacture employed" by the taxpayer and must result in a new and different product. *W. B. Knight Machinery Co.*, 6 T.C. 519, 530.

As an automobile producer, petitioner's method of operation was essentially that of an assembly manufacturer, i.e., it built its own engine and a few other component parts, but the bulk of the parts utilized in the production of its commercial automobiles was purchased from other suppliers and coupled together by its engineers so as to conform to the distinctive design of a particular Willys-Overland model.

Inasmuch as the specifications and characteristics of the jeep did not conform to the dimensions or design of any standard commercial automobile, petitioner's engineers were, of course, faced with numerous engineering problems and were forced to make many changes and modifications in design before they succeeded in producing an acceptable vehicle.

For example, the use in petitioner's jeep of its previously designed four-cylinder engine which was utilized in its regular Willys automobile created a weight handicap which required it to undertake a painstaking weight reduction analysis in order to bring the weight of its model below 2,175 pounds in order to meet the Army's weight specifications.

Prolonged difficulties were encountered in constructing the four-wheel drive so as to fit the desired dimensions and to accommodate petitioner's engine mounted in an off-center position. The greater portion of the engineering work on the axles, transfer case, and other components of the four-wheel drive used in the Willys jeep was performed by the Spicer Manufacturing Co.

Although more than half the parts used in the assembly of the jeep were standard parts and were also used in the production of the regular Willys car, a substantial number of parts, such as the transfer case, axles, transmission, universal joints, steering gear and linkage, muffler, carburetor, propeller shafts, etc., required special design and fabrication.

The type of work performed by petitioner in designing its light command and reconnaissance car for the Army and in solving the numerous automotive engineering problems which arose was described by Colonel Edwin S. Van Deusen, Chief of Engineering and Procurement in the Motor Transport Division of the Office of the Quartermaster General during 1940 and 1941, on cross-examination as follows:

Q. You were asked on direct examination with respect to differences in design as between the Bantam and Willys Overland pilot models. Isn't it the fact that each of those pilot models represented as a fact and in your opinion different and distinct designs?

A. Very definitely they were different and distinct designs. I think I said in my direct examination that the 1,500 each represented three different detailed designs.

Q. And that including engineering design?

A. Certainly. There is no question but what engineering design must be included in any motor vehicle assembly. I think I pointed it out. Even although the components may be assembled into a vehicle, there is basic engineering required in the fitting of those components together as an assembled vehicle.

After carefully considering the voluminous record presented herein, we are unable to conclude that the jeep produced by petitioner was a sufficiently radical departure from other automobiles in its design and operation as to constitute a new and different product. Nor can we find that the methods employed by petitioner in designing, engineering, and constructing the jeep according to Army specifications differed essentially from its regular methods of designing and engineering a new model Willys automobile for the civilian market.

The evidence presented discloses that the jeep embodied nothing really new or original in the way of automotive engineering concepts or principles, but simply combined into one vehicle a number of previously developed automotive component parts and devices. Although the building of the jeep required a considerable amount of engineering which involved numerous modifications and adjustments as the work progressed, the nature of the work performed was still

normal automotive design engineering, not "research, or development" under section 721(a)(2)(C). Petitioner's work in perfecting its 1/4-ton 4 x 4 truck for the Army differed, if at all, from the engineering activity customarily performed in designing its regular commercial automobiles only in degree, not in kind.

Most of the devices incorporated by Willys-Overland into its jeep which were not customarily used in commercial automobiles, such as the four-wheel drive, were nevertheless well known to the automotive industry. The parts employed in the jeep which were not previously known to the industry were minor and were devised through normal automotive engineering techniques, not through "research, or development."

Our conclusion that the jeep is not a substantially new or different product from previously known automobiles is borne out by the testimony of petitioner's Assistant Chief Engineer, Henry C. McCaslin, which was presented to the Federal Trade Commission in 1944 and introduced in evidence here:

Q. Would you say, Mr. McCaslin, that the combination of short wheel base, light weight, four wheel drive, high power ratio and the silhouette which is set out in Commission's Exhibit 96 was a new or novel idea in the automotive engineering field?

A. I would say so.

Q. It was not. The combination of those four characteristics?

A. I would say not.

Q. In one vehicle was not new?

A. No, sir.

Q. Had you ever seen those four characteristics combined in specifications or in an actual vehicle or in any design before that time?

A. Yes, sir.

Q. Would you tell us where?

A. The racing cars out at Indianapolis.

Q. I beg your pardon.

A. Racing cars at Indianapolis.

Q. Any place else?

A. I would say no.

Q. Whose racing cars and when?

A. I can't say that I can specifically name the year, but back in the 1920's.

TRIAL EXAMINER Cox. Did the racing cars have the short wheel base, too?

The WITNESS. They had short wheel bases, yes sir, but whether they were specifically up to 80 inches I can't specify that, but they were a short wheel base by comparison.

By Mr. HIERS:

Q. The silhouette which is sketched on Commission's Exhibit 96, did you ever see that silhouette on a racing car?

A. That specific silhouette? No.

Q. Did you ever see anything closely similar to that silhouette?

A. I have seen them that low but not with the same road clearance.[2]

Petitioner strongly contends that its newly designed four-cylinder

---

[2] Respondent's Exhibit 18–W, pp. 1172–1174.

engine, developed during the years 1938 to 1941, was the most important component of its jeep and that its work during those years in improving its engine for use in its regular commercial automobile constituted "research, or development" under section 721(a)(2)(C) and must be connected with its subsequent work in producing the jeep for the Army in determining its right to qualify for relief under section 721.

The engine used in petitioner's 1937- and 1938-model automobiles was a four-cylinder L-head engine having 134-cubic-inch displacement. This engine had been adopted initially by the Willys-Overland Co. for use in its commercial automobiles in about 1926. The two major deficiencies in petitioner's 1938 engine were insufficient horsepower output and insufficient endurance. Numerous other deficiencies were also apparent in the 1938 engine, as we have set forth in detail in our Findings of Fact in *Overland Corporation*, 34 T.C. 1001.

During 1938 petitioner undertook a program to improve its engine so that it could perform in accordance with acceptable commercial standards and compete effectively with the engines used by other automobile manufacturers. Petitioner made extensive improvements in the engines used in the 1939- and 1940-model automobiles, but it was not able to produce an engine which would achieve the level of performance set by its engineers until 1941.

Petitioner has failed to show any connection between its work in upgrading its four-cylinder engine and its subsequent work in producing the jeep. The engineering work performed in the improvement of petitioner's 1938-model engine was undertaken solely for the purpose of improving the quality and marketability of its civilian Willys automobile. With few modifications this engine was later employed in the jeeps produced for the Army and in the jeeps produced in later years for civilian use.

The use of this engine in the jeep was by no means the sole cause of its acceptance by the Army and cannot be said to have contributed to the vehicle anything new or unique. It is true that the Willys engine was more powerful than the engines used in the Ford and Bantam jeeps, but Ford and Bantam also produced acceptable jeeps for the Army, each using its own engine. In fact, the Quartermaster General expressed a preference for Ford as the contractor on the contemplated contract for 16,000 jeeps. Petitioner, as noted above, was awarded this contract because it had submitted the lowest per unit bid price. So far as appears from the record, petitioner could as easily have obtained the same contract by using a different engine so long as it met Army specifications. Further, in later years it apparently could have marketed the jeep commercially just as readily as it did by using its own engine.

If, however, petitioner's improved four-cylinder engine were in

fact indispensable both to the military and civilian acceptance of the jeep, we are unable to find that the automotive engineering work performed in the improvement of its engine during the years 1938 to 1941 constituted "research, or development" within the meaning of section 721(a)(2)(C). Although the improved four-cylinder Willys engine included many new features which its 1938 model and previous models did not possess, all such improvements appear to have been well known in the automotive industry. The improvements incorporated into petitioner's four-cylinder engine during the years 1938 to 1941 resulted simply from the application of standard engineering techniques and principles, not from "research, or development." See *L. E. Carpenter & Co.*, 29 T.C. 562. In improving its engine during the short period between 1938 and 1941, petitioner was merely carrying out in a brief period the natural development of its engine which should, in order that it remain competitive, have taken place in the ordinary manufacturing process of a producer of motor vehicles over the years prior thereto.

For the above-stated reasons we conclude that petitioner has failed to establish that it realized any income from its "research, or development of tangible property" within the meaning of section 721(a)(2)(C) of the 1939 Code and consequently it did not realize abnormal income which is attributable to prior years under section 721(b).

*Issue 2. Bankruptcy Reorganization—Section 112(b)(5)*

FINDINGS OF FACT

The petitioner was organized as Willys-Overland Motors, Inc., sometimes hereinafter referred to as petitioner or the new company, under the laws of the State of Delaware on July 25, 1936. It was one of two corporations created pursuant to the plan of reorganization of the Willys-Overland Co., sometimes hereinafter referred to as the old company, and its wholly owned subsidiary Willys-Overland, Inc., under the provisions of section 77B of the Bankruptcy Act, as amended.

The Willys-Overland Co. was organized under the laws of the State of Ohio on November 18, 1912. Substantially all of its business consisted of the manufacture and sale of automobiles and automobile parts. Its principal place of business was located in Toledo, Ohio.

The history of the receivership and subsequent bankruptcy reorganization of the old company and its wholly owned subsidiary Willys-Overland, Inc., together with the formation and capitalization of petitioner and Willys Real Estate Realization Corp., which occurred during the period February 15, 1933, to April 23, 1937, is set forth in detail in our Findings of Fact in *Overland Corporation*, 34 T.C. 1001, at 1011–1024, inclusive, which are incorporated herein.

The outstanding claims against the old company and Willys-Overland, Inc., or their respective properties, which were entitled to participate in the plan of reorganization were classified as follows:

Gold bonds of the old company [1] _____ $2, 000, 000. 00
General unsecured indebtedness of the old company and Willys-
Overland, Inc_____ 5, 945, 938. 65

Total _____ 7, 945, 938. 65

[1] On which there was unpaid interest from Sept. 1, 1932, to June 30, 1936, amounting to $552,554.14.

The order of confirmation entered by the District Court of the United States for the Northern District of Ohio, Western Division, on August 28, 1936, contained, in addition to the matters set forth in our Findings of Fact in *Overland Corporation, supra*, the following pertinent provisions:

36. Each issuance, transfer or exchange of securities, including stock of any class, warrants, certificates of subscription rights, certificates of subscription privileges, scrip, including shares of stock to be issued for the purpose of raising new money for working capital, and shares of stock to be distributed to creditors of each of the debtors, and for all other purposes stated in the Plan, which by this order are directed, provided for or necessary to be made, including the issuance, transfer or exchange of any securities by or to either of the Trustees or to any distributing agent, and the making and delivery of the respective conveyances pursuant to the terms of this order, are all to make the Plan effective, and such securities are to be issued pursuant to the Plan by this order confirmed under and in accordance with the provisions of Section 77B and within the meaning of subdivision (f) and subdivision (h) of Section 77B.

*It Is Therefore, Ordered, Adjudged and Decreed* as follows:

\*          \*          \*          \*          \*          \*          \*

*Tenth.* \* \* \*

\*          \*          \*          \*          \*          \*          \*

All shares of stock of the New Company and of the Real Estate Company issuable pursuant to this paragraph and the Eighth paragraph shall be issued as of September 15, 1936, and shall be deliverable upon the closing date which is hereby fixed as 33 days after the entry of this order, conditional upon the expiration of the time for appeal from this order without an appeal therefrom, or in case of an appeal, the same shall have been finally disposed of and no longer pending without possibility of reversal of this order.

\*          \*          \*          \*          \*          \*          \*

*Eighteenth.* Each holder of Bonds, unsecured claims against the Old Company, and any assignor to Empire of unsecured claims against the Old Company and the holder of preferred and common stock of the Old Company shall, subject to the right conferred upon the holders of preferred and common stock of the Old Company, pursuant to the subscription certificates issued in accordance with the Seventeenth paragraph next foregoing, have the privilege to subscribe to units, each consisting of one share of preferred stock and one share of common stock of the New Company on the basis of $10.00 per unit. A subscription blank shall be forwarded to each person entitled so to subscribe and shall be in the form hereto attached, marked Exhibit "D." Any such person entitled thereto, who desires to subscribe for shares of stock of the New Company shall, on or before the thirty-fifth day after the entry of this order, file with City Bank

Farmers Trust Company, as Depository, 22 William Street, New York, New York, subscription for the number of units subscribed for, on the form of the subscription blank hereto attached, to be accompanied by certified check or other remittance in New York funds to the City Bank Farmers Trust Company of at least $1.00 per unit for each unit subscribed for. The balance payable on account of such subscription shall be payable not later than noon, Eastern Standard Time, on October 5, 1936. * * *

    *     *     *     *     *     *     *

*Twenty-Second.* An underwriting agreement, substantially in the form shown in Exhibit "F" hereto attached, shall be executed by E. H. Rollins & Sons, Incorporated, in behalf of itself and the several underwriters, and by Empire. Said underwriting agreement shall be dated the same date as the entry of this order and shall be effective from and after said date. No substantial modification of said underwriting agreement shall be made without the approval of this court. At the time of the taking up of unsubscribed units by the underwriters pursuant to the terms and conditions of the underwriting agreement, or in case all of the units are subscribed pursuant to terms of the Plan and thus the underwriters are not required to take up unsubscribed units, upon consummation of the Plan, the New Company shall pay the considerations and issue to E. H. Rollins & Sons, Incorporated, and to each of the underwriters shares of stock of the New Company in accordance with the provisions of said agreement; such shares of stock of the New Company when issued shall be fully paid and non-assessable. If the underwriters exercise the right to terminate their obligations under subdivision (5) of clause Second of said agreement, Empire or the New Company may supply other underwriter or underwriters who will perform the terms and conditions of the underwriting agreement to be done and performed by the underwriters under said agreement.

The above-mentioned underwriters' agreement, captioned Exhibit F, which was executed by Empire Securities, Inc., and E. H. Rollins & Sons, Inc., the underwriters' representative, provided as follows:

THIS AGREEMENT, dated as of _____ 1936, between *Empire Securities, Inc.,* a Delaware corporation, (herein sometimes called "Empire"), and (herein sometimes called the Underwriters' Representative") :

WITNESSETH :

That for and in consideration of the mutual covenants and agreements hereinafter set forth, it is hereby agreed between the parties hereto as follows:

### FIRST

I. Empire states as follows:

(a) On February 15, 1933, the United States District Court for the Northern District of Ohio, Western Division, appointed John N. Willys and Linwood A. Miller as receivers of The Willys-Overland Company (hereinafter sometimes called "Old Company") in a suit brought by The Monroe Auto Equipment Company; on December 30, 1933, Mr. Miller resigned and D. R. Wilson of Pontiac, Michigan, was appointed to fill the vacancy; on August 25, 1935, Mr. Willys died and thereafter Mr. Wilson was continued as sole receiver. On February 25, 1936, the Old Company filed a petition under Section 77B of the Bankruptcy Act and on the same day the court approved the filing of the petition and appointed D. R. Wilson as Trustee. On March 20, 1936, the appointment of D. R. Wilson was made permanent. The operations of the company are continuing under the jurisdiction of the United States District Court under the provisions of Section 77B of the Bankruptcy Act. The proceedings under said Section 77B are hereinafter sometimes called the Reorganization Proceedings.

(b) Empire represents that it is the owner of more than 70% of the 6½% Gold Bonds of The Willys-Overland Company issued and outstanding under an indenture to the National City Bank of New York, as Trustee, (The Ohio Savings Bank and Trust Company having resigned as co-trustee), which bonds owned by Empire are represented by certificates of deposit issued pursuant to a certain agreement creating a Bondholders' Protective Committee for such bonds. Empire also represents that it is the owner of more than 97% of the unsecured indebtedness of The Willys-Overland Company, exclusive of inter-company indebtedness.

(c) Empire has furnished to the Underwriters' Representative appraisals made by West Brothers, Inc., who were employed by the Trustee in the Reorganization Proceedings with the approval of the District Court, which appraisals cover properties, both real and personal, owned by the Old Company and its subsidiaries and which show the opinion of the appraisers as to the gross amount which could reasonably be expected to be obtained by disposal of each property, as a whole or in part, on a maximum realization based upon the assumption that the business must be liquidated and also shows the present going concern value of certain assets, real and personal, which it is contemplated the New Company hereinafter described will acquire and own, either by direct title or through stock ownership. Said appraisals are dated May 27th, 1936.

(d) Empire has furnished the Underwriters' Representative also with a copy of a report made by Sanderson & Porter, engineers, under date of April 13th, 1936, who were employed by the Trustee in the Reorganization Proceedings with the approval of the District Court, to make an examination of the affairs of The Willys-Overland Company and its subsidiaries by checking the market for passenger automobiles now being manufactured or capable of being manufactured by the Trustee in the Reorganization Proceedings, the adequacy of the company's plant proposed to be acquired by the New Company hereinafter described and to be by it used in the future for the manufacture of such automobiles, the estimated funds required for plant changes or improvements and for tools, dies, etc., estimates of suitable allowances for depreciation of plant and amortization of investment in tools, dies, etc., and estimates of working capital requirements and of earning power based upon a certain assumed manufacturing and selling program.

(e) Empire has caused to be organized a corporation under the name of "Willys-Overland Motors, Inc.", (herein sometimes called the "New Company") under the laws of the State of Delaware, with an authorized capital stock consisting of 350,000 shares of 6% Convertible Cumulative Preferred Stock of the par value of $10 per share (hereinafter sometimes called "Convertible Preferred Stock") and 2,850,000 shares of Common Stock of the par value of $1 each. Said New Company shall be duly qualified to hold property and do business in the State of Ohio.

(f) Empire has filed in the Reorganization Proceedings a Plan of Reorganization of The Willys-Overland Company and Willys-Overland, Incorporated dated as of July 24, 1936, and an amendment thereto dated August 11, 1936, which Plan, as amended, provides for the payment by the Trustee in the Reorganization Proceedings to the New Company of $409,500 in cash and the transfer, assignment, conveyance and delivery to the New Company of all the properties and assets, both real and personal, described in Exhibit A hereto attached, in such manner that the New Company shall have good and sufficient title thereto, free and clear of all encumbrances, debts, liabilities, obligations or liens except (1) any taxes and assessments becoming payable in December, 1936, and thereafter; and (2) liability of The Willys-Overland Company and the Willys-Overland Pacific Company and of D. R. Wilson, as Trustee in bankruptcy of The Willys-

Overland Company, for workmen's compensation in a sum not to exceed $75,000, subject to changes on account of normal use. Said Plan of Reorganization, as amended, is herein sometimes referred to as the "Plan" or the "Plan of Reorganization."

(g) Said Plan of Reorganization provides that the Preferred and Common Stock of the New Company to be outstanding under the Plan, including the shares underwritten in this Agreement, shall be as follows:

*6% Convertible Preferred Stock:* 350,000 shares, of the par value of $10 each, subject to reduction in the event that any of the holders of the $585,000 principal amount of 6½% Gold Bonds of the Old Company which are not owned by Empire elect to take Common in lieu of Preferred Stock of the New Company in respect of their bonds.

*Common Stock:* 1,959,050 shares, subject to increase in the event that any of the holders of the $585,000 principal amount of 6½% Gold Bonds of the Old Company which are not owned by Empire elect to take Commin [*sic*] in lieu of Preferred Stock of the New Company in respect of their bonds. (Such increase will reduce the Preferred Shares to be outstanding.)

Said Plan further provides that all shares of Preferred and Common Stock of the New Company to be outstanding under the Plan shall be fully paid and nonassessable; that the New Company will receive in cash, provided the Underwriters fulfill their commitment hereunder, an aggregate of $3,500,000.00, namely an amount equal to the par value of the Preferred Stock to be outstanding (out of which there is to be payable to the Underwriters the $175,000 provided for in subdivision (15) of Clause *Second* hereof), and that 50,000 shares of the Common Stock under the Plan will be transferred and delivered to the Underwriters' Representative for its services as hereinafter set forth and 200,000 shares will be transferred and delivered to the Underwriters as hereinafter defined, or their nominees, in accordance with the terms hereof.

(h) Said Plan of Reorganization provides that a maximum of 40,950 shares of 6% Convertible Preferred Stock of the New Company, or 3 shares of Common Stock of the New Company in lieu of 1 of Preferred shall be issuable under the Plan (together with certain shares of another company) to the holders of the $585,000 principal amount of 6½% Gold Bonds of the Old Company which are not owned by Empire, and that not less than 309,050 Units, each Unit consisting of one share of Convertible Preferred Stock and one share of Common Stock of the New Company, shall be offered under and pursuant to the Plan of Reorganization when confirmed in the Reorganization Proceedings at a price of $10 per Unit to security holders and creditors of the Old Company as set forth in the Plan.

II. Empire agrees that no changes shall be made in the Plan of Reorganization above mentioned without the approval in writing of the Underwriters and that upon acquisition by the New Company of the property and assets mentioned in subdivision (f) of Article I, Empire will deliver or cause to be delivered to the Underwriters' Representative:

(a) a certificate or other written instrument from Sanderson & Porter that such properties and assets, real and personal, so transferred, assigned, conveyed and delivered to the New Company are the properties and assets and all the properties and assets deemed by Sanderson & Porter to be necessary or desirable for the business and operations of the New Company contemplated in their said report dated April 13, 1936; and

(b) title policies or opinions of Ohio counsel, satisfactory to counsel for the Underwriters, as hereinafter defined, that the New Company has title as aforesaid to such properties and assets, real and personal, so transferred, assigned, conveyed and delivered to it.

Empire represents that upon the transfer, assignment, conveyance and delivery to the New Company of the property and assets, real and personal, set forth in Exhibit A hereto, a balance sheet of the New Company based upon (a) the value of the property and assets, real and personal, described in said Exhibit A, as fixed by West Brothers, Inc., Appraisers; (b) the fair value as determined by the inventory of the Trustee of any parts inventory or other property included in the assets which are to be transferred and conveyed to the New Company or to be owned by Willys Export Corporation, the Willys-Overland Pacific Company and Willys-Overland Parts Corporation, which will either be wholly owned subsidiaries of the New Company or will transfer and convey their assets to the New Company; and (c) the receipt by the New Company of moneys as aforesaid will be substantially as set forth in the form of tentative pro forma balance sheet attached hereto as Exhibit C.

### SECOND

Upon the basis of the foregoing statements, representations and agreements on the part of Empire, it is mutually agreed between Empire and the Underwriters, that upon and subject to the terms and conditions hereinafter set forth, Empire will cause the New Company to sell to each of the Underwriters named below, severally and not jointly, and/or to their several nominees, and such Underwriters will severally purchase from the New Company, or find purchasers for, Units consisting of one share of Convertible Preferred Stock and one share of Common Stock of the New Company in the number in the case of each Underwriter set opposite its respective name as follows:

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

Empire also agrees to be responsible for the shares of stock deliverable under the Plan to holders of 6½% Gold Bonds of the Old Company not owned by Empire in the same manner and to the same extent as if Empire had purchased said shares and sold them to such bondholders and accordingly shall be entitled to compensation hereunder as an Underwriter in like manner as if its undertaking to underwrite Units were for the sum of its own commitment above set forth plus 40,950 Units.

The parties above named are herein collectively designated as the "Underwriters", and the word "Units" includes the shares constituting the Units. It is definitely understood that the obligation of each of the Underwriters named in the foregoing paragraph to purchase the Units from the New Company is several and is limited to the number of Units written opposite its name.

The terms and conditions upon and subject to which the foregoing agreement to purchase is made are as follows:

(1) Prior to the expiration of thirty-five days from the date hereof (or such later date as the Underwriters may severally agree to), the New Company shall have been duly formed and qualified to do business in the State of Ohio, shall have received from the Trustee in the Reorganization Proceedings $409,500 cash (or satisfactory arrangements for such payments shall have been made), and shall have acquired the assets hereinbefore described or referred to now owned by The Willys-Overland Company and/or one or more of its subsidiaries, free and clear of liens and encumbrances except as above mentioned, for and in consideration of the issuance and delivery of, or the obligation to issue all shares of its Convertible Preferred Stock issuable under the Plan to holders of 6½% Gold Bonds of the Old Company and all shares of its Common Stock to be outstanding under the Plan, shall have elected Mr. Ward M. Canaday, Chairman of the Board of Directors and Mr. D. R. Wilson its President, and shall have done or in a manner satisfactory to the Underwriters' Representative shall have

**54**

arranged to do all other things contemplated to be done on or before said date by the New Company as herein or in said Plan of Reorganization set forth.

(2) Prior to the expiration of thirty-five days from the date hereof (or such later date as the Underwriters may severally agree to), said Plan of Reorganization shall have been confirmed in the pending Reorganization Proceedings under Section 77B of the Bankruptcy Act in the United States District Court for the Northern District of Ohio, Western Division, and the Plan, as so confirmed, shall have been put into effect and carried out and shall have become binding on The Willys-Overland Company and any of its subsidiaries included in the Plan and all creditors and stockholders thereof and any and all right of appeal from the Order confirming the Plan shall have expired or otherwise finally terminated and any and all such appeals which may have been taken shall have been finally disposed of and no longer pending.

(3) The Certificate of Incorporation of the New Company shall be in the form and terms of Exhibit B, except to the extent changed or modified with the written consent of the Underwriters' Representative.

(4) The pro forma balance sheet of the New Company, after giving effect to the issue and sale of the Units contemplated hereby will be substantially the same as Exhibit C hereto and will, in the opinion of independent certified public accountants satisfactory to the Underwriters' Representative, correctly set forth on a pro forma basis the financial condition of the New Company as of the last day of the month next preceding the final confirmation of the Plan. The Plan shall not be deemed to have been finally confirmed until it shall have been duly confirmed by Court order from which no appeal can be taken or as to which the time of appeal has expired and there shall be no appeal therefrom. No underwriter shall be bound to take up and pay for any of the units underwritten by such underwriter pursuant to this agreement unless all of the units underwritten are paid for on the closing date.

(5) If at any time prior to final confirmation of the Plan in the opinion of the Underwriters' Representative or of Underwriters who herein agree, subject to the terms hereof, to purchase not less than 50% of the Units underwritten, there shall be any material adverse change in economic or financial conditions, or in the conditions affecting the success of the New Company from those existing at the date of this Agreement, or the Underwriters shall discover any condition unknown to them at the date of this Agreement which in their opinion materially adversely affects the success of the New Company, the Underwriters shall have the right to terminate their obligations hereunder. In case of the exercise of such rights by the Underwriters, Empire and the New Company shall each be released and discharged from every of their obligations under this Agreement, except for their obligation to pay the fees and disbursements of the Underwriters' counsel as provided in paragraph (10) hereof. The plan shall not be deemed to have been finally confirmed until it shall have been duly confirmed by court order from which no appeal can be taken, or as to which the time of appeal shall have expired and there shall be no appeal pending.

(6) The issuance of the Units by the New Company, and the form and terms of its Certificate of Incorporation and By-Laws and all other instruments and documents to be executed by or affecting the New Company and the title of the New Company to its properties free and clear of liens and encumbrances except as aforesaid, shall be subject to the approval of the Underwriters' Representative and their counsel, as well as the question of whether there shall have been a final confirmation, as such term is hereinbefore defined, of said Plan of Reorganization.

(7) The price per Unit, consisting of one share of Convertible Preferred Stock and one share of Common Stock of the New Company, shall be $10, all of which shall be paid to the New Company and used by it to make the payment to the

Underwriters provided for in subdivision (15) of this clause *Second* and in its business as working capital and for other proper corporate purposes.

(8) Empire agrees that the New Company will diligently endeavor when and as requested by the Underwriters' Representative to qualify the Units and the shares of Convertible Preferred and Common Stock included therein, and the shares of Common Stock referred to in subdivisions (14) and (15) hereof, for offer and sale under securities or blue-sky laws of any States which the Underwriters' Representative may designate.

(9) Empire will cause the New Company promptly to use its best efforts to procure the listing of the Units and/or of the Convertible Preferred and Common Stock included therein, (and the shares of Common Stock referred to in subdivisions (14) and (15) hereof), on the New York Stock Exchange and the registration thereof under the Securities Exchange Act of 1934, upon written request at any time from the Underwriters' Representative.

(10) Empire agrees that the New Company will pay and bear all costs and expenses in connection with the issuance and delivery of the Units, including (but without being limited thereto) any stamp or other taxes connected with the issuance thereof, obtaining certification or qualification of the Units and/or Convertible Preferred and Common Shares included therein and of the 250,000 common shares to be delivered pursuant to subdivisions (14) and (15) hereof under the blue-sky laws of such States as the Underwriters' Representative may designate as hereinbefore provided, and the preparation and delivery of certificates therefor, including the actual charges and expenses of mailing, insurance, etc. Empire will also deliver to the Underwriters' Representative without cost to the Underwriters, such subscription blanks, warrants, descriptive data, and other papers, in form satisfactory to counsel for the Underwriters' Representative, as may reasonably be requested. In the event the Underwriters shall terminate their obligations under this Agreement pursuant to the provisions of subdivision (5) of this Clause *Second*, Empire agrees that it or the New Company will pay the fees and disbursements of Messrs. Chadbourne, Hunt, Jaeckel & Brown, counsel for the Underwriters, herein sometimes referred to as the "Underwriters' counsel." In the event that the underwriting transaction contemplated in this Agreement is not consummated for any other reason Empire agrees that it or the New Company will pay the fees and disbursements of the Underwriters' counsel and the out-of-pocket expenses of the Underwriters' Representative in connection with the transaction. In the event that the underwriting transaction contemplated in this Agreement is consummated, payment of the fees and disbursements of the Underwriters' counsel and the out-of-pocket expenses of the Underwriters' Representative is provided for in subdivision (15) of this Clause *Second*.

(11) Empire will cause the New Company to enter into an agreement:

(a) to furnish the Underwriters' Representative an annual audit setting forth the financial condition of the New Company and its several subsidiaries, both on an individual and a consolidated basis, including (without being limited thereto) balance sheet, annual income statement, analysis of surplus and summary of changes (if any) in reserves, together with the auditor's comments and notations with respect thereto, all in reasonable detail and certified by independent public or certified accountants satisfactory to the Underwriters' Representative; and

(b) to furnish the Underwriters' Representative quarterly earnings statements and balance sheets of the New Company and its several subsidiaries, both on an individual and on a consolidated basis, which shall be in reasonable detail but need not be certified by independent public or certified accountants.

The New Company shall also agree to comply with all applicable requirements of the Securities Act of 1933 and the Securities Exchange Act of 1934, both

## 56

as now or hereafter amended, and with all applicable rules and regulations of the Securities and Exchange Commission under said Acts, as from time to time in force, so far as necessary to permit the continuance of sales or dealings in the Units or the Convertible Preferred and Common shares included therein.

(12) If any of the Underwriters shall fail or refuse to purchase the Units which it has herein undertaken to purchase, or any thereof, the other Underwriters who desire to do so shall have the right, but shall not be obligated, to purchase said Units in proportion to the respective number of Units which they have severally agreed to purchase herein or in such other proportion as they may agree upon, or to find or procure another underwriter or undewriters for said Units. The provisions of this paragraph shall not apply if the Underwriters exercise the right to terminate their obligations under this Agreement.

(13) Subscriptions to Units by holders of bonds of, claims against, and Preferred and Common Stock of The Willys-Overland Company, pursuant to subscription certificates or other instruments, shall first be filled.

As soon as may be, and in any event within three days after the expiration of the subscription rights aforesaid, the Underwriters shall receive written notice from Empire of the number of Units not subscribed for pursuant to such subscription rights (hereinafter sometimes called "unsubscribed Units") and the several obligations of the Underwriters to purchase Units hereunder shall apply only to such unsubscribed Units.

The Units which the Underwriters will be called upon severally to purchase shall be computed on a pro rata basis according to the number of Units set forth above opposite the respective names of the Underwriters and the Units the Underwriters are severally called upon to purchase shall be taken and paid for by each of the Underwriters, against delivery of certificates therefor, upon seven day's [sic] written notice to each of the Underwriters, provided, however, that in no event shall any of the Underwriters be called upon to purchase a greater number of Units than its pro rata of the unsubscribed Units or than is set opposite its signature hereto, whichever is less.

(14) In addition to the 50,000 shares of Common Stock of the New Company to be delivered to the Underwriters' Representative as provided in subdivision (15) hereof, there will be delivered to the Underwriters, for and as consideration for the underwriting contemplated hereby, by the New Company, 200,000 shares of Common Stock of the New Company, to be divided among the Underwriters pro rata according to the number of Units respectively underwritten by the Underwriters except that for the purpose of such division, Empire shall be treated as if the Units delivered under the Plan to holders of 6½% Gold Bonds of the Old Company which are not owned by Empire had been underwritten by Empire. At the time of the taking up by each Underwriter of its proportion of the unsubscribed Units, there shall be delivered to each Underwriter its pro rata portion of the 200,000 shares of Common Stock of the New Company which are the consideration of this underwriting. In case all of the units are subscribed pursuant to the terms of the plan and thus the underwriters are not required to take up unsubscribed units, there shall be delivered, upon consummation of the plan, to each underwriter who has not prior thereto terminated its obligation under the underwriting agreement its pro rata portion of the 200,000 shares of Common Stock of the New Company.

(15) There shall be delivered to the Underwriters' Representative by the New Company 50,000 shares of Common Stock of the New Company for and in consideration of the following but without any further consideration to be paid by or received from the Underwriters' Representative:

(a) Services of the Underwriters' Representative in connection with working out plans for, and advising with respect to, the financing of the New Company; and for its services in connection with the underwriting contemplated by this

Agreement by the Underwriters herein named and its participation in this Agreement to that end;

(b) Agreement of the Underwriters' Representative that it will assist Empire in making available to holders of bonds of, claims against, and Preferred and Common Stock of The Willys-Overland Company and/or Willys-Overland, Incorporated, information pertaining to the New Company as furnished to the Underwriters' Representative by Empire and the New Company and the opportunity of such holders to subscribe to Units of the New Company.

Empire also agrees that the New Company will pay to the Underwriters' Representative the sum of $175,000.00 to be used by the Underwriters' Representative as follows:

Out of said sum $35,000.00 will be retained by the Underwriters' Representative to compensate it for organizing within its various offices personnel and facilities to endeavor to furnish information to those having subscription rights and desiring to obtain information with regard to the same. Out of the remainder of such sum, namely, $140,000.00 there shall be paid the fees and disbursements of the Underwriters' counsel, and any sum remaining thereafter may be paid by the Underwriters' Representative, for such purposes and in such amounts as it may determine, to salesmen, dealers and others who procure the exercise of subscription rights by those entitled to exercise the same, and/or as commissions or concessions to the members of any selling group that may be formed and/or as expenses in connection with the formation and management of the selling group including expenses of the Underwriters' Representative for itself and the other Underwriters in connection with the selling group, the excess (if any) of such funds remaining after the payment of all the foregoing to be distributed to the Underwriters who have fulfilled their obligations hereunder in proportion to their respective commitments in this Agreement. In the application of such moneys, except the $35,000.00 to be retained by the Underwriters' Representative as above provided, the Underwriters' Representative shall be treated on the same basis as the other Underwriters.

(16) All shares of stock included in the Units or otherwise deliverable hereunder, including shares deliverable to the Underwriters as compensation for the underwriting and the shares deliverable to the Underwriters' Representative under subdivision (15) hereof shall, in the opinion of Underwriters' counsel be fully paid and non-assessable.

(17) All notices, consents, requests, agreements and approvals and all modifications or amendments to any instruments contemplated hereunder or made in connection herewith are to be in writing and signed by the Underwriters' Representative. Any notice of other communication (a) to the Underwriters hereunder shall be given to the Underwriters' Representative at_____ _____ and (b) to Empire at 10th Floor, Home Bank Building, Toledo, Ohio.

(18) This Agreement shall enure to and be binding upon the several underwriters and their successors and assigns and shall enure to the benefit of and be binding upon Empire, its successors and assigns. Nothing expressed or mentioned in this Agreement is intended or shall be construed to give any person or corporation other than the parties hereto and their respective successors and assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained; this agreement and all conditions and provisions hereof being intended to be and being for the sole and exclusive benefit of the parties hereto and the respective successors and assigns and for the benefit of no other person or corporation.

*In witness whereof*, Empire Securities, Inc., has caused this Agreement to be executed on its behalf by its duly authorized officers and its corporate seal to be hereunto affixed and attested; and

has executed this Agreement in behalf of itself and the several Underwriters herein named by causing the same to be signed by its duly authorized officers and its corporate seal to be duly affixed and attested; all as of the date of this Agreement.

As of September 15, 1936, when petitioner issued its common and preferred shares to the bondholders and creditors of the old company in exchange for its operating assets, the transferors of such assets were temporarily in control of the new company, owning 100 percent of its then outstanding stock.

Written notice of the number of the 309,050 units remaining unsubscribed was given to the underwriters by Empire Securities, Inc., immediately after October 2, 1936, the date on which the subscription rights held by the bondholders, creditors, and stockholders of the old company expired. The obligations of the underwriters became irrevocable not later than October 6, 1936, the date on which the U.S. Court of Appeals for the Sixth Circuit denied a motion requesting leave to appeal. Prior to October 12, 1936, the underwriters took up firm commitments to subscribe to their respective shares of the petitioner's remaining unsubscribed units. Payment in full was made for such subscriptions by the underwriters prior to October 31, 1936. A portion of these units were sold to other subscribers.

The stock of the new company which was issued to the underwriters and to purchasers therefrom was never issued to the bondholders, unsecured creditors, or stockholders of the old company.

Petitioner's assets as of October 31, 1936, were obtained from the indicated classes of shareholders which owned all of its outstanding voting stock in the amounts and percentages shown in the following table:

| | Shares of stock issued | | | Percent | Assets acquired | | |
|---|---|---|---|---|---|---|---|
| | Common | Preferred | Total voting | | From predecessors | As fresh risk capital | Total |
| Gold bondholders of old company | 383,355 | 12,215 | 395,570 | ------- | | | |
| General unsecured creditors of old company | 1,102,850 | -------- | 1,102,850 | ------- | $12,766,688.33 | -------------- | $12,766,688.33 |
| | | | | | 409,500.00 | -------------- | 409,500.00 |
| Subtotal | 1,486,205 | 12,215 | 1,498,420 | 63.32 | 13,176,188.33 | -------------- | 13,176,188.33 |
| Subscribed by Empire Securities, Inc. | 9,218 | 9,218 | 18,436 | .78 | -------------- | $92,180.00 | 92,180.00 |
| Prior subscription by old company stockholders and creditors | 110,541 | 110,541 | 221,082 | 9.34 | -------------- | 1,105,410.00 | 1,105,410.00 |
| Total | 1,605,964 | 131,974 | 1,737,938 | 73.44 | 13,176,188.33 | 1,197,590.00 | 14,373,778.33 |
| Underwriters and representative | 250,000 | -------- | 250,000 | 10.56 | -------------- | -------------- | -------------- |
| Noncreditor subscribers | 189,291 | 189,291 | 378,582 | 16.00 | -------------- | 1,892,910.00 | 1,892,910.00 |
| Total | 439,291 | 189,291 | 628,582 | 26.56 | -------------- | 1,892,910.00 | 1,892,910.00 |
| Grand total | 2,045,255 | 321,265 | 2,366,520 | 100.00 | 13,176,188.33 | 3,090,500.00 | 16,266,688.33 |

The underwriters' agreement executed pursuant to the order of the District Court by Empire Securities, Inc., and E. H. Rollins & Sons, Inc., the underwriters' representative, was an inseparable part of the plan of reorganization, and the temporary retention of all petitioner's voting stock by the transferors of the assets of the old company was an essential step in the overall plan which contemplated the public issuance of a sufficient number of shares to reduce the stock ownership of the transferors to less than 80 percent of the stock of the new company.

### OPINION

On February 25, 1936, the Willys-Overland Co., which was then in receivership under the jurisdiction of the District Court of the United States for the Northern District of Ohio, filed a petition with that court under the provisions of section 77B of the Bankruptcy Act, as amended. The petition sought the reorganization of the Willys-Overland Co. under the provisions of section 77B of the Bankruptcy Act, as amended.

Empire Securities, Inc., which owned approximately 70 percent of the outstanding bonds of the old company and about 97 percent of the claims of unsecured creditors against the old company, together with approximately 91 percent of the unsecured claims against Willys-Overland, Inc. (a wholly owned subsidiary of the old company which had joined in the consolidated bankruptcy proceedings), submitted to the court a proposed plan of reorganization of the debtor corporations.

On August 28, 1936, the District Court of the United States for the Northern District of Ohio entered an order of final confirmation approving, with certain amendments, the plan of reorganization submitted by Empire Securities, Inc. The outstanding claims against the old company and Willys-Overland, Inc., or their respective properties at the date of reorganization, which were entitled to participate in the plan of reorganization were classified as follows:

Gold bonds of the old company [1]_____ $2,000,000.00
General unsecured indebtedness of the old company and Willys-
 Overland, Inc_____ 5,945,938.65
  Total _____ 7,945,938.65

[1] On which there was unpaid interest from Sept. 1, 1932, to June 30, 1936, amounting to $552,554.14.

The order of the court confirming the plan of reorganization which was entered on August 28, 1936, found that the Willys-Overland Co. and its subsidiary, Willys-Overland, Inc., were insolvent and that their shareholders had no equities in the properties of the respective companies. Under the plan of reorganization all the assets of the old company and each of its several subsidiaries were to be transferred

to two new corporations: (1) petitioner, an operating company chartered on July 25, 1936, under the laws of Delaware, and (2) Willys Real Estate Realization Corp., a liquidating corporation chartered on or about August 21, 1936, under the laws of Delaware.

All of the assets deemed essential to the operation of the business of manufacturing and selling automobiles were conveyed to petitioner and the remainder of the assets held by the old company and its subsidiaries was conveyed to Willys Real Estate Realization Corp.

Petitioner acquired from the old company and its subsidiaries operating assets having a book value on the books of the old company and its subsidiaries of $12,766,688.33.

The plan of reorganization as confirmed by the District Court on August 28, 1936, provided that the authorized capital stock of petitioner was to consist of 350,000 shares of 6 percent convertible preferred stock having a par value of $10 per share, all of which was to be outstanding,[3] and 2,850,000 shares of common stock having a par value of $1 per share. The plan contemplated that 1,959,050 shares of common stock would be outstanding.[4] Both the preferred and common stock were voting stock.

It was determined by a firm of consulting engineers, employed by the trustee of the old company to make a study of its position in the automotive industry, that the new company would require additional cash in the amount of approximately $3,500,000 to enable it to produce 60,000 cars per year. For the purpose of providing this additional working capital the plan of reorganization provided for: (1) the payment to the new company by the trustee of the old company of $409,500 for 40,950 shares of preferred stock which were issuable to holders of gold bonds (other than Empire Securities, Inc.) upon their election,[5] and (2) the issuance of 309,050 shares of preferred stock, together with a like number of shares of common stock of the new company, in units consisting of one share of each at $10 per unit pursuant to the offering for subscription and an underwriting agreement provided for in the plan.

The order of the court entered on August 28, 1936, granted the holders of the preferred and common stock of the old company a prior right for a period of 35 days after entry of the court's order (or until October 2, 1936) to subscribe to 309,050 units of stock (each unit consisting of 1 share of preferred and 1 share of common stock of

---

[3] Subject to reduction, however, to the extent that holders of gold bonds (other than Empire Securities, Inc.) elected to take common stock at the rate of 210 shares for each 70 shares of preferred stock of the new company to which they were entitled under the plan and each $1,000 bond held.

[4] Subject to increase to the extent that the holders of gold bonds (other than Empire Securities, Inc.) elected to take common stock of the new company in lieu of the preferred stock to which they otherwise were entitled.

[5] Regardless of whether the gold bondholders elected to take petitioner's preferred or common stock, the trustee was required to pay $409,500 to the new company.

petitioner at $10 per unit) on the basis of 1 unit for each share of the preferred stock of the old company held and 1 unit for each 17 shares of the common stock of the old company held.

Subject to the prior rights of the stockholders of the old company, any holder of its gold bonds or unsecured claims, and any assignor to Empire Securities, Inc., of unsecured claims against the old company, and the holders of preferred and common stock of the old company were entitled to subscribe to the above-mentioned 309,050 units (consisting of one share of preferred and one share of common stock of the new company at the rate of $10 per unit) during the 35-day period following the entry of the order of the court.

The order further provided that all of the shares of stock of petitioner which were issuable to the bondholders and creditors of the old company were to be issued as of September 15, 1936, and were to be delivered upon the closing date which was fixed therein as 33 days following the entry of the order (or September 30, 1936).

The order of the court also provided:

*Twenty-Second.* An underwriting agreement, substantially in the form shown in Exhibit "F" hereto attached, shall be executed by E. H. Rollins & Sons, Incorporated, in behalf of itself and the several underwriters and by Empire. Said underwriting agreement shall be dated the same date as the entry of this order and shall be effective from and after said date. No substantial modification of said underwriting agreement shall be made without the approval of this court. At the time of the taking up of unsubscribed units by the underwriters pursuant to the terms and conditions of the underwriting agreement, or in case all of the units are subscribed pursuant to terms of the Plan and thus the underwriters are not required to take up unsubscribed units, upon consummation of the Plan, the New Company shall pay the considerations and issue to E. H. Rollins & Sons, Incorporated, and to each of the underwriters shares of stock of the New Company in accordance with the provisions of said agreement; such shares of stock of the New Company when issued shall be fully paid and non-assessable. If the underwriters exercise the right to terminate their obligations under subdivision (5) of clause Second of said agreement, Empire or the New Company may supply other underwriter or underwriters who will perform the terms and conditions of the underwriting agreement to be done and performed by the underwriters under said agreement.

Pursuant to the plan of reorganization the holders of gold bonds of the old company elected to take and were issued 12,215 shares of petitioner's preferred stock and 383,355 shares of its common stock in exchange for their gold bonds and in consideration of the transfer of their equity in the portion of the assets of the old company represented by the bonds.[6]

The unsecured creditors of the old company who elected to receive petitioner's stock took 1,102,850 shares of its common stock in ex-

---

[6] The gold bondholders of the old company (other than Empire Securities, Inc.) were authorized to take 40,950 shares of petitioner's preferred stock. The gold bondholders elected to receive a total of 86,205 shares of petitioner's common stock in lieu of 28,735 shares of preferred stock, thereby retaining 12,215 preferred shares in the new company.

change for their claims and in consideration of the transfer of their equities in the assets of the old company.[7]

Empire Securities, Inc., which also operated as a securities underwriter, purchased 9,218 preferred shares and 9,218 common shares of the new company. The creditors and stockholders of the old company subscribed to 110,541 shares of petitioner's preferred stock and 110,541 shares of its common stock.[8]

As compensation for their services under the underwriters' agreement executed pursuant to the order of the court, 250,000 shares of petitioner's common stock were issued to the underwriters and their representatives.

Subscribers who were not creditors of the old company purchased 189,291 shares of preferred stock and 189,291 shares of common stock of petitioner.

After the underwriters took up their commitments following the receipt of written notice given by Empire Securities, Inc., of the number of unsubscribed shares remaining upon the expiration of the prior subscription rights held by the stockholders, bondholders, and creditors of the old company, the total number of outstanding shares of petitioner's voting stock held by the various classes of shareholders and the percentage of its outstanding shares held by each class may be summarized as follows:

|  | Total outstanding voting shares | Percentage |
|---|---|---|
| Gold bondholders of old company | 395, 570 |  |
| General unsecured creditors of old company | 1, 102, 850 |  |
| Subtotal | 1, 498, 420 | 63. 32 |
| Subscribed by Empire Securities, Inc | 18, 436 | . 78 |
| Prior subscription by old company stockholders and creditors | 221, 082 | 9. 34 |
| Total | 1, 737, 938 | 73. 44 |
| Underwriters and representative | 250, 000 | 10. 56 |
| Noncreditor subscribers | 378, 582 | 16. 00 |
| Total | 628, 582 | 26. 56 |
| Grand total | 2, 366, 520 | 100. 00 |

The respondent contends that the assets acquired by Willys-Overland Motors, Inc., from its predecessor corporation were transferred

---

[7] Certain unsecured creditors did not elect to take petitioner's stock (or the stock of Willys Real Estate Realization Corp.) but received in lieu thereof cash in the amount of 25 percent of the principal amount of their claims, or a total of $41,008.58, from the trustee of the old company in accordance with the order of the District Court. Further, holders of mechanics' liens received $2,741 in full settlement thereof from the trustee of the old company pursuant to the order of the court.

[8] The record does not disclose the amount of such shares which were purchased by creditors of the old company or the amount purchased by its stockholders.

to it in a nontaxable transaction to which section 112(b)(5)[9] of the Revenue Act of 1936 applies and that pursuant to the provisions of section 113(a)(8) thereof petitioner's basis for the assets so acquired is the same as it would have been in the hands of the transferors.

Petitioner has taken the position that the transaction whereby petitioner acquired the assets of the old company and its subsidiaries is a taxable transaction because it fails to satisfy two of the requirements of section 112(b)(5) and consequently petitioner's basis for the assets so acquired is equal to their cost at the time of acquisition.[10]

The parties agree on brief that the bondholders and creditors of the old company were the equitable owners of its assets and that under the principles of *Helvering* v. *Limestone Co.*, 315 U.S. 179, and *Helvering* v. *Cement Investors*, 316 U.S. 527, such bondholders and creditors are to be regarded as the transferors of assets under section 112(b)(5) of the Revenue Act of 1936.[11]

To sustain his position it is incumbent upon the respondent to establish[12] that the transaction in question satisfies each of the three requirements prescribed by section 112(b)(5):

[9] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(b) EXCHANGES SOLELY IN KIND.—

\*      \*      \*      \*      \*      \*      \*

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.

[10] The parties are in agreement that sec. 112(b)(10) of the 1939 Code, enacted as sec. 121(a) of the Revenue Act of 1943 (which provides that the transfer of assets from one corporation to another pursuant to "an order of the court having jurisdiction of such corporation" in a proceeding brought under sec. 77B or Chapter X of the National Bankruptcy Act, as amended, is a nontaxable reorganization), has no application to the years here involved.

[11] In *Helvering* v. *Limestone Co.*, the Supreme Court enunciated the rule that when the "old creditors become the stockholders of the new corporation, it conforms to realities to date their equity ownership from the time when they invoked the processes of the law to enforce their rights of full priority. At that time they stepped into the shoes of the old stockholders." Under this principle the bondholders and unsecured creditors of the insolvent Willys-Overland Co. became the owners of its property not later than the time the bankruptcy proceeding was initiated under sec. 77B of the Bankruptcy Act, as amended. In *Helvering* v. *Cement Investors,* the Supreme Court held that the first mortgage bondholders of a debtor corporation were the beneficial owners of its assets and may be treated as the transferors of such assets for purposes of qualifying an exchange under sec. 112(b)(5) of the Revenue Act of 1936.

[12] In our Findings of Fact in *Overland Corporation,* 34 T.C. 1001, under issue 2, we stated:

"On July 28, 1958, respondent filed an amended answer to the fourth amended petition in which he claimed deficiencies in petitioner's excess profits tax for the fiscal years ended September 30, 1942 and 1943, in the amounts of $1,159,295.86 and $959,195.42, respectively. The respondent also asserted he had erroneously concluded the reorganization to which the petitioner was a party and pursuant to which it had acquired assets on August 31, 1936, was a taxable transaction, whereas he now claims the transaction was nontaxable under section 112(b)(5) of the 1939 Code." Inasmuch as the issue involving the nonrecognition under sec. 112(b)(5) of gain or loss resulting from the exchange of the property of the old company for stock pursuant to the plan of reorganization as confirmed by the District Court represents a claim by the respondent for an increased

(1) That there was a transfer of property from one or more persons to a corporation solely in exchange for stock or securities;

(2) That immediately after the transfer such person or persons were in control of the corporation; and

(3) That the amount of stock and securities received by each transferor is substantially in proportion to his interest in the property prior to the exchange.

It is unquestioned that the bankruptcy reorganization of the Willys-Overland Co. and the organization and capitalization of the petitioner included the transfer of assets to it by the creditor-owners of the old company solely in exchange for the stock of the new company, and that the first requirement set forth in section 112(b)(5) therefore was satisfied.

The petitioner contends, however, that neither the second nor the third of the above-mentioned requirements of section 112(b)(5) was met by the transaction here involved. With respect to the second requirement, viz, that immediately after the transfer the transferors of assets must be in control of the transferee corporation, it is the petitioner's position that such control of the new company by the bondholders and unsecured creditors of the old company was lacking.

Section 112(h) of the Revenue Act of 1936 defines "control" for purposes of section 112(b)(5) as the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.[13]

As of September 15, 1936, when petitioner issued its common and preferred shares to the bondholders and creditors of the old company in exchange for its operating assets, the transferors temporarily owned 100 percent of its then issued and outstanding stock. However, at the point of the original issuance of petitioner's stock to the transferors of the old company's assets, the new company still lacked the $3,500,000 capital needed to commence operations as a manufacturer of automobiles. From the inception of the plan of reorganization as confirmed by the District Court, it was the intention of all parties to the reorganization proceeding, as well as of the court itself, that necessary working capital in the amount of $3,500,000 would be raised primarily by the public sale of its stock through arrangements with securities underwriters. Consequently the issuance of

deficiency based upon new matter raised by him for the first time in his amended answer to the fourth amended petition, the burden of proof as to this issue rests upon him. *Estate of Harry Schneider,* 29 T.C. 940; *Kimbell-Diamond Milling Co.,* 10 T.C. 7; *Berkshire Cotton Manufacturing Co.,* 5 B.T.A. 1231; Rule 32, Tax Court Rules of Practice.

[13] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(h) DEFINITION OF CONTROL.—As used in this section the term "control" means the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

309,050 additional shares through the exercise of subscription rights held by the bondholders, creditors, and stockholders of the old company and through the public sale of the unsubscribed shares was part and parcel of the reorganization plan as confirmed by the order of the court. The new company could not become more than a lifeless shell unless the court's order was fully complied with.

In support of his position the respondent contends that the phrase "immediately after the exchange" as contained in section 112(b)(5) refers to the point at which the transferors, who were the bondholders and creditors of the old company, received petitioner's stock in exchange for the properties of the old company. As noted above, the receipt of petitioner's stock by the transferors of the assets of the old company was an essential step in the execution of the overall plan contemplated by the District Court in confirming the plan of reorganization. We are unable to accept the proposition that in determining stock ownership "immediately after the exchange" we must sever the various parts of the complex reorganization plan here involved and ignore one of the paramount purposes thereof which was the acquisition of fresh capital from new subscribers through a public issuance of the stock of the new corporation.

We are supported in our application of the step-transaction principle to the situation here involved by the decision of the Second Circuit in *Bassick* v. *Commissioner*, 85 F. 2d 8, affirming 30 B.T.A. 163, certiorari denied 299 U.S. 592. The situation there involved complicated arrangements for the transfer to a new corporation, Bassick-Alemite Corp., of a controlling stock interest in another corporation with an arrangement for the distribution of part of the securities of the new corporation by a banking corporation. The taxpayers there contended that at one stage in the involved transfer arrangements the transferors of the old company owned all of the outstanding stock of the new company and that the transaction accordingly satisfied the requirements of section 202(c)(3)(B) of the Revenue Act of 1921 (a provision corresponding to section 112(b)(5) of the Revenue Act of 1936). The Court of Appeals there held that the component steps of an integrated transaction cannot be treated separately and that the question of control of the new company must be determined by the stock ownership existing at the completion of the overall plan rather than at the occurrence of one of the intermediate steps. Since the steps there involved were found to be inseparable parts of a single plan and since at the conclusion thereof the transferors held less than 80 percent of the voting stock of the new corporation, the court concluded that the transaction fell outside the scope of section 202 of the Revenue Act of 1921.

A somewhat analogous situation was presented in *Hazeltine Corporation* v. *Commissioner*, 89 F. 2d 513, reversing on other grounds

32 B.T.A. 110. The taxpayer was a newly organized corporation which had acquired assets from its predecessor, Hazeltine Research Corp., in exchange for 155,250 shares of its stock. Prior to the exchange the transferors of its assets had executed a contract with an underwriter which required Hazeltine Research Corp. to sell 135,000 of its shares in the new company to the underwriter for resale to the public. The terms of the underwriter's agreement were performed 21 days after the formation of the taxpayer and the underwriter commenced public trading in the taxpayer's stock.

The Court of Appeals for the Third Circuit sustained the taxpayer's contention that the transaction did not qualify as a nontaxable exchange under section 112(b)(5) of the Revenue Act of 1928 because the transferors never possessed more than momentary control of the transferee. The Court of Appeals there said:

An examination of the contract of February 2d discloses quite clearly that there was no intention by Hazeltine Research Corporation to retain more than 20,250 shares of petitioner's stock for any length of time; the remaining 135,000 shares to which it was entitled were to be simultaneously delivered to Foster, McConnell & Co. for $650,000 in cash. * * * We are satisfied that the transaction must be viewed as a whole. * * * So viewed, Hazeltine Research Corporation did not retain control of petitioner after it was carried through. * * *

Similarly in *Maine Steel, Inc.* v. *United States*, 174 F. Supp. 702, the taxpayer was a newly organized corporation, a successor to Maine Steel Products Co. which was in financial difficulties with its creditors. Pursuant to a plan worked out with the creditors of Products, the taxpayer was organized and acquired all of the assets of the old company in exchange for which Products acquired all of the taxpayer's stock. The new company also assumed all of the debts of its predecessor. Products then transferred all of the stock of Maine Steel, Inc., to Fidelity Trust Co. which was its principal creditor and holder of its outstanding mortgage note. Fidelity Trust Co. in turn sold all of the taxpayer's stock to a group of new owners. The U.S. District Court there rejected the taxpayer's contention that the transaction constituted a tax-free transfer of assets to a controlled corporation under section 112(b)(5) of the Revenue Act of 1936 since, viewing the transaction as a whole, neither Products nor Fidelity Trust Co., its principal secured creditor, owned 80 percent of its stock for more than a brief period of time. The "control" requirement of section 112(b)(5) and section 112(h) was accordingly held to be unsatisfied by such transitory ownership of the new corporation's stock. The court stated in its opinion as follows:

The transfer of the stock from Products to Fidelity and its sale by Fidelity to the Soule group was contemplated from the inception of the plan of reorganization; it was an integral part of the plan as adopted by the stockholders of Products and formalized by the written agreement signed by Mr. Soule, as

President of Products and individually, and by Mr. Braun, as Conservator of Fidelity; and even assuming that there was, as plaintiff asserts, no *legally* binding obligation on Fidelity to sell plaintiff's stock to the Soule group, it is manifest that the incorporation and exchange would never have been agreed upon without the supplemental agreement turning over the stock to Fidelity and eventually to the Soule group, which was, in fact, the *sine qua non* of the entire transaction * * *

\* \* \* \* \* \* \*

In situations such as that disclosed by the present record, the courts properly have refused to break up a unified transaction into its constituent elements, and have not hesitated to find that what was done amounted to one single transaction for income tax purposes. * * *

The respondent places considerable reliance upon our decision in *American Bantam Car Co.*, 11 T.C. 397, affirmed per curiam 177 F. 2d 513, certiorari denied 339 U.S. 920. The taxpayer was a newly formed corporation organized on June 2, 1936, to acquire the assets of the American Austin Car Co. which previously had been purchased by three individuals who in turn transferred them to the taxpayer, together with a small amount of cash, in exchange for all of its outstanding common stock. The exchange of stock for assets occurred on June 3, 1936.

On June 8, 1936, American Bantam Car Co. executed a contract with certain stock underwriters in which it agreed to give the underwriters an exclusive selling order on 90,000 shares of its preferred stock at a public offering price of $10 per share. The agreement provided that if the underwriters failed to execute the selling order in accordance with the selling schedule contained therein, the taxpayer had the option to cancel the order upon giving 10 days' notice. The three individuals who owned the 300,000 shares of the taxpayer's outstanding common stock also executed a contract on June 8, 1936, with the same underwriters in which they agreed to deliver 100,000 shares of common endorsed in blank to a bank for later transfer to the underwriters upon the sale by them of the taxpayer's preferred stock.

On August 16, 1936, the taxpayer's three stockholders executed an escrow agreement with the bank under which it was to hold 100,000 shares of the taxpayer's common stock in escrow for future delivery to the underwriters upon the receipt of the proceeds of sale of 90,000 preferred shares. During October 1937, nearly 17 months after the original exchange, one of the underwriters fulfilled its portion of the agreement and received from the bank 87,900 shares of the taxpayer's common stock. As a result of the acquisition of such shares by the underwriter, the stock ownership of the individual stockholders of the taxpayer was reduced to less than 80 percent of its outstanding voting stock.

We there refused to apply the step-transaction principle and held that the individual transferor-stockholders were in control of the

taxpayer "immediately after the exchange" and the transaction therefore qualified as a nontaxable exchange under section 112(b)(5) of the Revenue Act of 1936. In our opinion in *American Bantam Car Co., supra*, we stated as follows:

In determining whether a series of steps are to be treated as a single indivisible transaction or should retain their separate entity, the courts use a variety of tests. Paul, Selected Studies in Federal Taxation, 2d series, pp. 200–254. Among the factors considered are the intent of the parties, the time element, and the pragmatic test of the ultimate result. An important test is that of mutual interdependence. Where the steps so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series?

Using these tests as a basis for their decisions the courts in *Hazeltine Corporation* v. *Commissioner*, 89 Fed. (2d) 513, and *Bassick* v. *Commissioner*, 85 Fed. (2d) 8, treated the series of steps involved in each case as parts of a unified transaction and therefore determined that the transferors of assets to the new corporation did not acquire the requisite control. An analysis of the fact situations involved shows salient distinguishing features from the present facts. In each of the above cases there was a written contract prior both to the organization of the new corporation and the exchange of assets for stock which bound the transferors unconditionally to assign part of the stock acquired to third parties after the exchange. Thus, at the moment of the exchange the recipient of the stock did not own it, but held it subject to a binding contractual obligation to transfer a portion. The court in each case thought that the incorporation and exchange would never have been agreed upon without the supplemental agreement turning over stock to a third party. In such situations it is logical for the courts to say that the exchange and the subsequent transfer are part of one and the same transaction, so that the transferor never actually owned the shares he later assigned.

A close examination of the facts surrounding the exchange in the present case makes it clear that the exchange of assets for stock and the subsequent transfer of a portion of that stock to Grant therein involved should not be considered part of the same transaction so as to deprive the associates of "control" immediately after the exchange. The facts are distinguishable from those existing in the *Hazeltine* and *Bassick* cases on three grounds. First, there was no written contract prior to the exchange binding the associates to transfer stock to the underwriters. At the most, there was an informal oral understanding of a general plan contemplating the organization of a new corporation, the exchange of assets for stock, and marketing of preferred stock of the new corporation to the public. A written contract providing for the transfer of shares from the associates to the underwriters did not come until five days after the exchange. Secondly, when the transfer of shares to the underwriters was embodied specifically in a formal contract, the underwriters received no absolute right to ownership of the common stock, but only when, as, and if, certain percentages of preferred stock were sold. How clearly contingent was the nature of their rights is illustrated by the fact that only one underwriter, Grant, met the terms of the agreement and became entitled to any shares. Thirdly, the necessity of placing the 300,000 shares in escrow with a bank is indicative of complete ownership of such stock by the associates following the exchange.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The very fact that in the contracts of June 8, 1936, the associates retained the right to cancel the marketing order and, consequently the underwriters' means to own common stock issued to the associates, refutes the proposition that the

legal relations resulting from the steps of organizing the corporation and transferring assets to it would have been fruitless without the sale of the preferred stock in the manner contemplated.

We are of the opinion that the same reasons which we felt distinguished the situation in *American Bantam Car Co.*, *supra*, from *Hazeltine Corporation* v. *Commissioner*, *supra*, and *Bassick* v. *Commissioner*, *supra*, likewise serve to distinguish the transaction presented in *American Bantam Car Co.* from the facts presented here. Whereas in that case a written contract for the public sale of the Bantam preferred stock was not executed until 5 days after the exchange there in question, the record here discloses that the execution of the underwriting agreement constituted a condition of the order of the District Court confirming the plan of reorganization and was intended by the court and all parties in interest to represent an essential and inseparable part of the reorganization plan.

Further, the documents executed by Bantam and its stockholders on June 8, 1936, constituted merely a "selling order" or an option to purchase the 90,000 preferred shares, whereas the agreement here in question constituted a definite underwriting contract which not later than October 6, 1936, became an irrevocably binding obligation to purchase the underwritten stock.

The underwriters who executed the Bantam selling order were entitled to acquire 100,000 shares of its common stock only upon the completed sale of a specified block of preferred shares, whereas here the underwriters were entitled to receive 250,000 common shares of the new company as compensation at the time their underwriters' obligation became fixed.

In further contrast to the present case, the original Bantam shareholders remained in control of the new corporation for nearly 17 months after the exchange of assets for stock and the execution of the selling order because not until October 1937 did the underwriters become entitled to receive the common stock which caused the holdings of the transferors to be reduced below 80 percent. Here, the bondholders and creditors of the old company held more than an 80 percent controlling interest in the petitioner for not more than 21 days.

Not only did the transferors of the assets of Willys-Overland Co. own more than 80 percent of the outstanding stock of petitioner for only a brief period *but from the inception of the reorganization plan it was never contemplated that they would retain 80 percent of petitioner's stock for any substantial period of time* and certainly not by the time the reorganization had been completed. The common stock which the underwriters became obligated to purchase not later than October 6, 1936, was never issuable nor issued to the transferors of the old company because they had failed to exercise their rights to subscribe thereto.

The subscription rights granted by the plan to the holders of gold bonds, unsecured claims, and stock of the old company were available only for a period of 35 days following the entry of the order of the District Court on August 28, 1936, or until October 2, 1936. The several underwriters listed in the agreement were required thereunder to purchase the unsubscribed portion of the 309,050 units upon 7 days' written notice to be given within 3 days following the expiration of the subscription rights of the bondholders, creditors, and stockholders of the old company.

Under paragraph (5), page 11, of the underwriters' agreement the contract was terminable by the underwriters prior to "final confirmation of the plan." The last sentence of paragraph (5) defines the time of final confirmation as follows:

The plan shall not be deemed to have been finally confirmed until it shall have been duly confirmed by court order from which no appeal can be taken, or as to which the time of appeal shall have expired and there shall be no appeal pending.

Paragraph (2), page 10, of the agreement provides:

(2) Prior to the expiration of thirty-five days from the date hereof (or such later date as the Underwriters may severally agree to), said Plan of Reorganization shall have been confirmed in the pending Reorganization Proceedings under Section 77B of the Bankruptcy Act in the United States District Court for the Northern District of Ohio, Western Division, and the Plan, as so confirmed, shall have been put into effect and carried out and shall have become binding on The Willys-Overland Company and any of its subsidiaries included in the Plan and all creditors and stockholders thereof and any and all right of appeal from the Order confirming the Plan shall have expired or otherwise finally terminated and any and all such appeals which may have been taken shall have been finally disposed of and no longer pending.

The order of the District Court provided that no change in the underwriting agreement should be made without the prior approval of the court.

As we read the underwriters' agreement, the phrase "the final confirmation of the plan" refers to the order of confirmation entered by the District Court on August 28, 1936, subject to the expiration of the time for appeal or the disposition of a pending appeal. The time for taking an appeal from the order of confirmation of the District Court expired 30 days after the date of its entry.[14] On September 28, 1936, the last day prior to the expiration of the period of time during which an appeal might be taken, a stockholder of Willys-Overland Co. filed a motion in the Court of Appeals for the Sixth Circuit requesting leave to appeal from the order of confirmation.[15] On Octo-

---

[14] Act of July 1, 1898, ch. 541, sec. 24, 30 Stat. 553. as amended May 27, 1926, ch. 406, sec. 9(c), 44 Stat. 665.

[15] The 30th day following the entry of the confirmation order of the District Court on Aug. 28, 1936, fell on Sept. 27, 1936, which was a Sunday. Sec. 31 of the Act of July 1, 1898, ch. 541, 30 Stat. 554, provides that if the last day of the prescribed period falls on a Sunday or a legal holiday, the period is extended to the next succeeding day that is not a Sunday or a legal holiday.

ber 6, 1936, the Court of Appeals denied the motion for leave to appeal and struck it from the files.

Since pursuant to the underwriters' agreement the obligations of the underwriters became fixed upon the expiration of the time for appeal from the confirmation order or, in the event an appeal had been taken, at the time such appeal was finally disposed of, it is clear that the standby commitment of the underwriters became irrevocable not later than October 6, 1936.

The 35-day period during which subscription rights held by the bondholders, creditors, and stockholders of the old company were exercisable expired on October 2, 1936. Written notice of the number of the 309,050 units remaining unsubscribed immediately was given to the underwriters by Empire Securities, Inc. Prior to October 12, 1936, the underwriters took up firm commitments to subscribe to their respective shares of the petitioner's remaining unsubscribed units. Payment in full was made for such subscriptions (a total of 189,291 units) by the several underwriters prior to October 31, 1936. A portion of these units was in turn resold to other subscribers.

Subscriptions by underwriters and purchasers therefrom amounted to 16 percent of the total shares of petitioner's voting stock then outstanding. The new company also issued 250,000 new shares of its common stock to the underwriters as partial compensation for their services in underwriting and handling the public distribution of its stock. This amounted to 10.56 percent of its total outstanding voting stock. Thus 628,582 shares of its voting stock or 26.56 percent of its total of 2,366,520 outstanding voting shares were issued to underwriters and new subscribers.

If the transferors of assets to petitioner be regarded as having received its stock on the date of issuance fixed by the court decree, or September 15, 1936, they retained ownership of 100 percent of its stock for not more than 21 days, or until not later than October 6, 1936. But if the transferor-creditors are regarded as having acquired petitioner's voting preferred and common stock as of the date of delivery fixed by the order of the court, or September 30, 1936, they retained ownership of 100 percent of its stock for not more than 6 days. As noted above, the underwriters and purchasers therefrom bought 16 percent of petitioner's voting stock and as compensation for their services, the underwriters acquired 10.56 percent of such stock, leaving the transferors and prior subscribers together with no more than 73.44 percent of the outstanding voting stock of the new corporation which, even if owned entirely by the transferors, was a less than sufficient amount of stock to satisfy the "control" requirement of section 112(h). Only 64.1 percent of petitioner's voting stock was issued to the transferor-creditors of the old company (including the shares issued to Empire Securities, Inc.) in exchange for the assets

of Willys-Overland Co. Approximately 9.3 percent of the voting stock of the new company was issued pursuant to subscription rights exercised by the bondholders, creditors, and stockholders of the old company. The record does not disclose how much stock was issued to either the bondholders, creditors, or stockholders pursuant to the exercise of such subscription rights.

We are of the opinion that the underwriters' agreement was an inseparable part of the reorganization plan and that the receipt and temporary retention by the transferors of the assets of the old company of all of petitioner's voting stock was an indispensable step in an overall plan which contemplated the public issuance of a sufficient number of shares to reduce the stockholdings of the transferors to less than 80 percent of the outstanding voting stock of the new company. It is our view that the facts presented here fall within the rationale of *Hazeltine Corporation* v. *Commissioner, supra; Bassick* v. *Commissioner, supra;* and *Maine Steel, Inc.* v. *United States, supra.* Cf. *S. Klein on the Square* v. *Commissioner,* 188 F. 2d 127, affirming 14 T.C. 786; *Barker* v. *United States,* 200 F. 2d 223. We accordingly hold that the transferors of assets of the old company to petitioner in exchange for its stock were not in control thereof "immediately after the exchange" and that the transaction in question fails to qualify as a nontaxable exchange within the meaning of section 112(b)(5) of the Revenue Act of 1936. Accordingly, pursuant to section 113(a) of the Revenue Act of 1936 petitioner is entitled to utilize the cost of the assets acquired as its basis therefor.

Reviewed by the Special Division as to the 721(a)(2)(C) issue.

*Decision will be entered under Rule 50.*